RICHMOND HOSIERY MILLS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7763, 3703. Promulgated May 4, 1927.

1. The Board is unable from the evidence in this proceeding to determine what portion, if any, of amounts expended for advertising should be regarded as capital expenditures.

2. Contributions to an organization having for its purpose the gathering of statistics on imports and in keeping manufacturers advised of the tariff legislation, and to an organization having for its purpose the prevention of labor troubles were proper deductions from gross income as ordinary and necessary business expenses.

*Sam E. Whitaker, Esq.*, for the petitioner.
*George G. Witter, Esq.*, for the respondent.

The Commissioner determined deficiencies in income and profits taxes in the amounts of $15,666.60 for 1918, $28,598.86 for 1919, and $4,370 for 1920. The petitioner in both cases assigned several errors, but by stipulations and withdrawals only two questions are now in dispute: (1) Whether the petitioner may include in its invested capital an aggregate amount of $223,749.77 alleged to have

been expended during the years 1908 to 1914, inclusive, in an intensive advertising campaign to advertise a particular brand of hosiery under the trade-mark " Wunderhose " and charged at the time to current expense; (2) whether contributions made during the taxable years to the American Protective Tariff League and The League of Industrial Rights, of both of which petitioner is a member, are deductible from gross income.

It has been stipulated that (1) these two proceedings be consolidated for hearing and decision; (2) the Commissioner's determination with respect to the deduction of the commissions paid by petitioner on the sale of its preferred stock was correct; (3) the Commissioner correctly reduced invested capital for the years in question by the prorated amount of income and profits taxes shown to be due on returns filed for said years and by the amount of additional taxes for said years found to be due; (4) on January 1, 1914, the property of the petitioner had sustained a total depreciation of $125,716.88; (5) that in computing invested capital for the years in question the date of January 1, 1914, shall be taken as the starting point, and to reflect depreciation accrued to that date the above sum shall be deducted from the gross value of the taxpayer's depreciable property on that date as found by the Commissioner, and to reflect depreciation thereafter accruing the rates established by the Commissioner shall be applied.

### FINDINGS OF FACT.

The petitioner is a Georgia corporation organized in 1898 with principal office and place of business in Rossville. A portion of its business designated as the Chattanooga Knitting Mills is located at Chattanooga, Tenn. Prior to 1909 the Chattanooga Knitting Mills was operated under the name of Mathis-Davis Co. but has been a part of the Richmond Hosiery Mills' business since 1904. It is engaged in the manufacture and sale of hosiery.

From the date of organization until 1908 petitioner sold its goods without a trade name. In 1907, the Dry Goods Economist, a trade publication, proposed to it the adoption of a trade-mark " Wunderhose " and that an advertising campaign be carried on over a period of time in order to permanently establish with the public its good will and trade mark " Wunderhose." In 1908 the trade-mark " Wunderhose " was copyrighted and in the latter part of that year an intensive advertising campaign in the Dry Goods Economist and other trade journals was commenced, and continued until the early part of 1914, in the prosecution of which petitioner expended a total amount of $223,749.77, or approximately $35,000 a year. The amount paid or incurred in each of the years was charged to expense. During the six years succeeding this advertising cam-

paign an average of about $2,500 a year was spent for general advertising purposes. In the inauguration of this advertising campaign, the petitioner did so for the purpose and with the belief and conviction that by so doing it would thereby establish a permanent good will asset in its business.

The adoption of the trade-mark " Wunderhose " for a part of its hosiery business and the advertising campaign were parts of the same plan. The trade-mark " Wunderhose " portrayed a box containing four pairs of hose and the figure $1. Upon the adoption and registration of the trade-mark it was decided that goods sold under it should be advertised as the goods of the Chattanooga Knitting Mills, a trade name given to that portion of the petitioner's business. The plan was that the petitioner's salesmen should carry two lines of goods, one of the Chattanooga Knitting Mills, covered by the trade-mark " Wunderhose " and the other of the Richmond Hosiery Mills, which at that time had no trade-mark or trade brand. Prior to the time of the adoption of the trade-mark " Wunderhose " there was no such name in existence, nor was there any concern known to the trade as the Chattanooga Knitting Mills. Upon the adoption of the trade-mark " Wunderhose " sale of this merchandise was segregated on the books of the petitioner from all other sales.

In 1912 the petitioner adopted another trade brand known as "Arrowhead " which was designated as Richmond Hosiery Mills sales account. It also exported goods under a number of foreign trade-marks. The " Wunderhose " sales do not include any goods exported.

The gross sales of hosiery during the advertising campaign ending in 1914 were as follows:

| Year. | " Wunder-hose." | Other goods. |
|---|---|---|
| 1908 | $114, 526. 27 | $350, 333. 20 |
| 1909 | 209, 854. 00 | 436, 154. 39 |
| 1910 | 304, 103. 86 | 396, 878. 15 |
| 1911 | 425, 367. 62 | 335, 195. 11 |
| 1912 | 402, 671. 87 | 557, 040. 98 |
| 1913 | 347, 299. 70 | 618, 332. 28 |
| 1914 | 354, 401. 34 | 522, 119. 33 |

The gross sales of hosiery from 1915 to 1920, inclusive, were as follows:

| Year. | " Wunder-hose." | Other goods. |
|---|---|---|
| 1915 | $333, 841. 12 | $619, 737. 10 |
| 1916 | 431, 092. 56 | 951, 586. 39 |
| 1917 | 683, 407. 01 | 1, 030, 322. 28 |
| 1918 | 974, 083. 73 | 1, 564, 251. 22 |
| 1919 | 1, 024, 871. 60 | 2, 137, 587. 05 |
| 1920 | 1, 527, 389. 52 | 2, 570, 924. 26 |

The invested capital, net earnings, and the percentage of earnings to capital from 1908 to 1914, inclusive, after deducting amounts spent for advertising during this period, and the invested capital, net earnings, and percentage of earnings to capital for the period 1915 to 1920 follow:

| Year. | Invested capital. | Net earnings after deducting amounts expended in advertising "Wunderhose," 1908 to 1914. | Percentage of earnings to capital. |
|---|---|---|---|
| 1908 | $280,000.00 | $30,000.00 | 10.7 |
| 1909 | 349,488.01 | 58,188.01 | 10.9 |
| 1910 | 380,636.85 | 41,304.43 | 10.8 |
| 1911 | 421,687.38 | 51,004.53 | 12. |
| 1912 | 460,939.80 | 49,206.42 | 10.6 |
| 1913 | 501,580.86 | None. | 0. |
| 1914 | 546,218.94 | 36,728.27 | 6.7 |
| Average 1908-1914 | | | 8.8 |
| 1915 | 614,383.36 | 72,618.63 | 11.8 |
| 1916 | 639,471.09 | 137,749.17 | 21.5 |
| 1917 | 624,926.54 | 136,262.88 | 21.8 |
| 1918 | 709,027.21 | 118,519.06 | 16.7 |
| 1919 | 817,813.57 | 229,321.99 | 28. |
| 1920 | 1,371,477.06 | 98,501.68 | 7.2 |
| Average 1915-1920 | | | 17.8 |

The invested capital, net earnings, and the percentage of earnings to capital from 1908 to 1914, inclusive, after capitalizing the amount spent for advertising "Wunderhose" and the invested capital, net earnings, and the percentage of earnings to capital for the period 1915 to 1920, inclusive, subsequent to the advertising campaign, are as follows:

| Year. | Invested capital. | Net earnings after capitalizing advertising, 1908-1914. | Percentage of earnings to capital. |
|---|---|---|---|
| 1908 | $280,000.00 | $61,964.25 | 22.1 |
| 1909 | 381,452.26 | 90,152.26 | 23.6 |
| 1910 | 444,565.35 | 73,208.68 | 16.4 |
| 1911 | 517,581.13 | 82,968.78 | 16. |
| 1912 | 588,796.80 | 81,170.67 | 13.8 |
| 1913 | 661,402.11 | None. | 0. |
| 1914 | 738,004.44 | 84,612.25 | 11.4 |
| Average 1908-1914 | | | 14.8 |
| 1915 | 838,133.03 | 72,618.63 | 8.6 |
| 1916 | 863,220.86 | 137,749.17 | 16. |
| 1917 | 848,676.31 | 136,262.88 | 16. |
| 1918 | 932,776.98 | 118,519.06 | 12.7 |
| 1919 | 1,041,563.34 | 229,321.99 | 22. |
| 1920 | 1,595,226.83 | 98,501.68 | 6.2 |
| Average 1915-1920 | | | 13.6 |

The charging of expenditures for advertising to expense was in line with the consistent business policy adopted in the early days of the company to reduce the fixed assets of the company as nearly as possible to the sum of one dollar.

During the taxable years 1919 and 1920, petitioner was a member of the Amercan Protective Tariff League, an organization of manufacturers having for its purpose the gathering of statistics on the importation of hosiery and other merchandise, the keeping of corporations advised as to tariff legislation and the obtaining from corporations information as to what they consider to be to their advantage in this regard. During 1919 and 1920, petitioner made contributions to this organization in the amounts of $150 and $100, respectively. In 1919 petitioner contributed $100 to an association of manufacturers of which it was a member known as The League of Industrial Rights, organized to forward and promote the interests of manufacturers through prevention of labor disputes. The petitioner alleges that $25 contributed toward the securing of a Brigade Post at Chattanooga Park, near Rossville, Ga., should be deducted as a necessary business expense, but during the trial this question was waived by the petitioner.

### OPINION.

LITTLETON: Several questions were raised by the petition but all except two were withdrawn or stipulated. It is stipulated that the Commissioner's determination with respect to the deduction of the commissions paid by petitioner on the sale of its preferred stock, and the Commissioner's determination with respect to the reduction of invested capital for the years in question by the prorated amount of income and profits tax shown to be due on returns filed for said years and by the amount of additional tax for said years found to be due by the Commissioner was correct. In accordance with stipulation filed, the depreciation agreed upon, the value of property, and the rates established by the Commissioner with respect thereto are approved.

The two remaining questions are: (1) Whether the petitioner may include in invested capital for the years 1918, 1919, and 1920, the amount of $223,749.77 expended during the years 1908 to 1914, inclusive, for development of the trade-mark "Wunderhose"; (2) whether contributions made by the petitioner during the taxable years in question to the American Protective Tariff League and The League of Industrial Rights, of both of which petitioner was a member, were proper deductions from gross income as ordinary and necessary expense.

The petitioner was during the taxable years, and still is, engaged in the manufacture and sale of hosiery. Prior to 1908 it sold to jobbers and had no trade-mark or trade names. In 1908 it adopted the trade-mark "Wunderhose" and decided upon an intensive advertising campaign to cover a period from the end of 1908 until during the year 1914, involving the expenditure of approximately

$35,000 a year to establish the trade-mark "Wunderhose," and to build up a market for its product.

Approximately $35,000 a year was spent in advertising "Wunderhose" during this campaign. After the year 1914, when the campaign closed, only about $2,500 a year was spent for general advertising purposes. The sales of "Wunderhose" increased from about $115,000 in the first year of the inauguration of the advertising campaign to more than $354,000 during the campaign, and to $1,527,289.52 in 1920, the last taxable year in question.

It is evident that the amount of $223,749.77 for advertising purposes during the years 1908 to 1914, inclusive, was out of all proportion to the petitioner's business at that time, and is evidence of the fact, as was testified to by all of the officers of the corporation and others who were in a position to know, that it had in view the establishment of a permanent asset rather than merely increasing current business.

The Commissioner, while admitting that large sums were expended for advertising purposes, contends that the expenditures made were not of a capital nature but were ordinary and necessary expenses for the respective years, and as such amounts were charged to expense on the books of the petitioner it should not be permitted to restore the amounts to invested capital. The Commissioner further contends that even though a portion of the amount expended in this advertising campaign could be regarded as a capital expenditure, the petitioner has never made any segregation of the amount which could be properly termed a capital expenditure and the amount that represented a current expense item, and that the resulting capital asset, if any, did not have the value claimed during the taxable years.

The amount of money spent for expansion and promotion of its business by advertising the "Wunderhose" is not in dispute. The only question is whether the amount so spent was properly chargeable to current expense or whether at this time petitioner should be permitted to restore to capital the expenditures previously recorded on the books as current expense.

That an erroneous recordation of an expenditure is no bar to its ultimate restoration to its proper status for income and profits-tax purposes has been stated by the Board on several occasions. *Appeal of Gilliam Mfg. Co.*, 1 B. T. A. 967; *Appeal of Union Metal Mfg. Co.*, 1 B. T. A. 395; and *Appeal of Goodell-Pratt Co.*, 3 B. T. A. 30.

In each of the above-cited appeals, the fact that the expenditures were of a capital nature was not in dispute, whereas in this proceeding the main question at issue is whether the expenditures were of such a definite capital nature that they may be restored to, and considered a part of, petitioner's invested capital for the years on ap-

peal. Expenditures made in prior years and charged to expense will not be restored to capital in the absence of satisfactory evidence that the amount sought to be restored was specifically expended in the acquisition of an asset of a permanent nature. *Appeal of Cramer-Krasselt Co.*, 3 B. T. A. 388; *Appeal of Northwestern Yeast Co.*, 5 B. T. A. 232.

The petitioner argues with much plausibility that the expenditures in question resulted in the acquisition of an asset from which benefits ran to it through the succeeding years after the advertising campaign ceased and that therefore the entire amount should be considered a capital expenditure. It appears that after the expenditures ceased " Wunderhose" continued to be sold even in greater volume than before and we are asked to say, along a line of syllogistic reasoning, that therefore an asset of a permanent nature was acquired with the payment of $223,749.77 therefor, which should be capitalized.

The first difficulty arises from an inability to make a satisfactory segregation as between capital and expense of the entire amounts expended. It is evident that the petitioner was looking more to future, than present, sales when the advertising campaign was authorized and carried out, but it is likewise apparent that a substantial part of the amount in question produced immediate, rather than prospective, benefits. The public has a short memory concerning such matters as we are here dealing with. Because of this fact, established concerns continue their advertising campaigns in order to keep constantly before the people the product which they are manufacturing, as well as to prevent the usurpation of its place in the minds of the purchasing public by a similar article. The petitioner's product was of an inexpensive and short-lived nature and, therefore, the users of 1914 would not in all probability be the users in succeeding years without continued advertising, unless the character of the hose became so impressed on their minds that they would continue to ask for the same trade brand. The petitioner answers this argument by showing that its sales of " Wunderhose " not only continued after the advertising campaign closed, but also increased in the succeeding years. As to this we can not overlook the fact that the years following 1914 were abnormal years when other factors may have caused the continued sales in this line of goods and that the sales of the other products of the petitioner's plant showed a corresponding increase, without extended advertising. It should be noted also that traveling salesmen were constantly engaged in securing orders for " Wunderhose " in the same manner as they did for petitioner's other products.

As we have heretofore said in this opinion, the manner in which the petitioner treated its expenditures for advertising on its books

is not conclusive of their nature. This is particularly true of the years prior to the incidence of the income and profits-tax laws, but when we note that in 1925 the petitioner made an expenditure of $110,000, more than three times the average amount expended in the years from 1908 to 1914, and principally in advertising another brand of hosiery, and claims this as a deduction from gross income in its income-tax returns for that year, it is apparent that the petitioner is recognizing that sales for that year are attributable at least in part to current advertising. Although we are not passing on the correctness of the expenditure in 1925, we do consider that the policy of the company in 1925 and other years of charging advertising to expense is an evidentiary fact which may properly be considered in determining whether the expense in question is to be treated as capital or expense. It evidences a recognition that results from advertising a product of the character in question are in a measure immediate and are, therefore, more properly chargeable as an expense of the year when expended than as producing an asset the value of which will remain with, and be productive of income to, the company in the succeeding years.

The Board is satisfied that the advertising campaign carried on from 1908 to 1914 had for its major purpose the establishing of the trade-mark " Wunderhose " in such a way in the minds of the public purchasing this grade of hose that benefits to the petitioner would flow therefrom beyond the year when the expenditures were made, but we are not convinced that the entire amount was a capital expenditure when made nor are we satisfied that it resulted in the acquisition of an asset which was yet in existence to the extent claimed in the years on appeal. It may be that in such cases as this upon a proper showing, some portion of the total amount expended for advertising could be capitalized, but when we look to all of the facts and circumstances disclosed by the record in this proceeding any attempt to make an allocation as between expense and capital would be a mere guess unsupported by any sound reason. The action of the Commissioner in eliminating this item from invested capital must, therefore, be sustained.

The second question involved is whether the contributions made to the American Protective Tariff League and The League of Industrial Rights are proper deductions from gross income as ordinary and necessary business expenses.

The primary object of the American Protective Tariff League was to gather statistics concerning imports and to keep manufacturers advised concerning tariff legislation and obtain information from manufacturers as to what they considered to be for their best interest in that regard. We think the contributions for such purposes

come within the term of ordinary and necessary expense of carrying on a trade or business and that the Commissioner erred in denying the deduction of such contribution from gross income. The contribution to The League of Industrial Rights, an organization having for its purpose the prevention of labor troubles, was an expenditure directly connected with the business and was of such a character as properly to be considered an ordinary and necessary expense incident to the carrying on of a business. It should be allowed as a deduction from gross income. *Appeal of California Brewing Assn.*, 5 B. T. A. 347.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

MURDOCK concurs in the result only.