OAHU SUGAR CO., LTD., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 15852.   Promulgated September 19, 1928.

*A. A. Balantine, Esq., S. Milton Simpson, Esq.,* and *Bernard Knollenberg, Esq.,* for the petitioner.
*M. N. Fisher, Esq.,* and *L. C. Mitchell, Esq.,* for the respondent.

OPINION.

PHILLIPS: The decision of the first of the issues involved in this proceeding is governed by our decision in *Kahuku Plantation Co.*, 12 B. T. A. 977, as subsequently modified, 13 B. T. A. 292. The record in the two cases is substantially the same. Upon the authority of the decision in that case it is held that the Commissioner erred in including the payment on account of the net losses to the 1921 and 1922 crops in computing petitioner's taxable income for 1920.

This proceeding also involves the determination of the fair market value on March 1, 1913, of petitioner's leaseholds of sugar cane lands. It is one of several heard at the same time which raise the same question with respect to various leases of cane lands in the Hawaiian Islands. In this case, as in the others, it is alleged that the Commissioner committed error in the computation of the taxable net income when he refused to permit the deduction under section 234 (a) (7) of the Revenue Act of 1918 of a reasonable amount for the exhaustion of this asset. The right to a deduction for the exhaustion of such

an asset is not questioned, the Commissioner having acquiesced in the decision of the Board in *Grosvenor Atterbury*, 1 B. T. A. 169. The parties differ only as to the value of the leaseholds on the basic date. In this proceeding the petitioner contends that its leaseholds then had a fair market value of between $1,500,000 and $1,750,000; the respondent answers that they had no value.

On the basic date the petitioner held land under several leases expiring at various dates and owned some land in fee, the details being set out in our findings above. Of a total of approximately 11,700 acres controlled, over 8,500 acres were under cultivation. No sales or leases of sugar lands such as those of the petitioner were negotiated in or near 1913. There was no large parcel of land suitable for development into a sugar plantation which was not owned or under lease to one of the large plantations in the islands. The parties have consequently had recourse to the opinions of those familiar with cane plantations and leaseholds, to appraisals based on earnings, to evidence of sales of the capital stock of the petitioner and of other sugar properties, and to other evidence which counsel have regarded as having a bearing upon the situation.

We have in the record detailed statements of the assets and liabilities of the petitioner over a period of years prior to the basic date, of earnings both before and after the basic date, and of the cost of producing sugar and prices paid for it over a period of years. We have testimony setting out the history of the sugar industry in the Islands, dealing with the hazards of the industry, its progress, and its relation to the same industry in the States and elsewhere. We have been told how the cane is planted, ratooned, cultivated, irrigated, harvested, ground and marketed. The labor problem, insect pests, and the discovery and improvement of new and better varieties of cane all have their place in the evidence. The topography of the islands and of the various plantations, soil conditions, and climate are dealt with in the record. We have evidence of the trend of prices of sugar company stocks on the exchange and testimony of the situation which prevailed in the sugar industry in the islands on the basic date. The parties have set before us as complete a picture as it has seemed possible to draw with the evidence available at this time. It would be a needless burden, if not impossible, to set out this evidence here in detail or to discuss the relative weight given to various factors in arriving at our decision upon value. There are, however, some outstanding factors upon which the parties have laid emphasis which should be discussed.

The principal leases of the petitioner were made at a time when the practicability of profitable production of sugar on these lands had not been demonstrated. A substantial part of the lands were

situated well above sea level and required irrigation. Whether a sufficient and satisfactory supply of water could be obtained to operate the plantation at a profit was then questionable. The situation in 1913 was entirely different. By that year 60 artesian wells were in operation and water was pumped over a large part of the plantation by 12 pumping stations. It was pumped to a mean elevation of 385 feet, one of the highest elevations on the Islands for this operation. For several years prior to 1913 some 8,500 acres were under profitable cultivation by petitioner. In 1913 plans were under way to obtain a greater supply of water, which would permit cultivation of the remaining lands. Later we will have occasion to discuss these plans more fully. By 1913 what had originally been a speculation, fraught with substantial losses to the lessees should it be unsuccessful, had been proven practicable and was paying substantial profits to the petitioner.

The respondent relies upon the tariff situation as having seriously impaired, if not destroyed, any value which might otherwise have attached to the leaseholds by reason of profitable operation thereunder. On March 1, 1913, there was in effect a United States tariff on sugar of the kind produced by petitioner of 1.685 cents per pound. This rate had prevailed since 1897. Hawaii in 1913 was domestic territory and therefore entitled to sell its sugar in the United States free of this duty. This rate, after allowing for a differential of 20 per cent in favor of Cuban sugar which had been granted in 1903, was sufficient to permit the Hawaiian plantations to compete successfully with Cuban and other foreign growers despite the greater cost of producing and shipping their product. With this tariff in effect, the Hawaiian plantations had been prosperous. Without tariff protection, few, if any, could have been operated at a profit; there was reason to believe that most would have sustained substantial losses. The election of 1912 had changed the party in control of national policies. The platform of this party had promised tariff revision and the threat of reduction or elimination of the tariff on sugar was imminent. Just what the result might be was regarded as uncertain, for it was believed that anything which would harm the industry in the Islands would be even more harmful to the domestic growers of cane sugar in the south and beet sugar in the west.

The tariff situation must be recognized as one of the greatest hazards of the sugar industry in the Islands. A period of low tariff or free sugar means decreased profits or losses. The testimony would indicate that an indefinite continuation of such a situation might wipe out the sugar industry in the Islands. The testimony discloses further, however, that responsible business men, in touch with business and political conditions, were of the opinion that such

a situation was improbable. It was their opinion that a low tariff or no tariff protection might exist for a short time or even for a few years but that such a tariff policy would not continue long. This opinion was confirmed by subsequent events. In October, 1913, a law was passed providing for a 20 per cent reduction in the tariff on sugar, effective March 1, 1914, with a provision for the removal of all tariff after May 1, 1916. However, on April 27, 1916, this free-sugar clause was repealed and the duty continued at 1.256 cents per pound.

The most striking illustration of the effect of tariff revision upon the views of business men in the Islands which is presented in the record before us is furnished by the action of the directors of this petitioner. In 1913 it had 3,000 acres under lease which were not under cultivation. On these it paid no rental and incurred no expense except, perhaps, some small amount for taxes. It might, had it chosen to do so, have permitted these lands to remain as they were. Nevertheless, in December, 1912, the petitioner entered upon a project to bring water to these lands from the mountains, the cost of which was estimated at approximately $2,500,000. In March, 1913, work was begun on this project and was continued until 1916 when it was completed. In 1914, a bond issue of $2,500,000 was floated by the petitioner at 6 per cent. This was done when the tariff situation, from the Hawaiian point of view, was at its worst. It is very persuasive evidence that the value of sugar lands had not been destroyed, and that there was confidence in the industry that any setback would be temporary. We can not believe that in 1913 the future of the industry was looked upon as being as dark as counsel for the respondent would paint it.

On the other hand, the view of the situation now taken by petitioner and its witnesses seems to us to be colored with an optimism which was unjustified in 1913. It is not unnatural that their present views should be tinged to some extent by the unprecedented prosperity which followed the outbreak of the World War; a prosperity which could not have been foreseen in 1913 by the most hopeful planter.

The petitioner's witnesses based their opinions of value largely upon earnings of the years prior to 1913. During all of those years a favorable tariff situation prevailed. On March 1, 1913, the probabilities were that, for a time at least, profits would be seriously curtailed. Aside from the effect of a possible change in tariff, sufficient was known of the 1913 crop to indicate that it would be smaller and less profitable than that of any recent year. Neither a purchaser nor a seller would have been justified in ignoring these factors in arriving at the price at which they could negotiate a sale

of the leaseholds. They could not properly have regarded the earnings of the years immediately preceding 1913 as establishing a basis representative of earnings to be expected in the near future. Earnings of the past play their proper part in helping to arrive at the present market value only if they are considered in connection with all other surrounding facts which may be helpful in determining whether future earnings will be more or less.

In computing taxable income the Commissioner has already allowed deductions for the exhaustion of the depreciable assets of the petitioner, including improvements to the leased lands, based on their value on March 1, 1913. For the purpose of fixing this value it would appear that the depreciated cost on that date had been used in valuing many, if not all, of these assets. Many of the improvements, such as wells and irrigating ditches, are so closely associated with the leases as to be inseparable. Exhaustion of the improvements having been allowed, that which we are now called upon to value is the bare leasehold interests. We do not understand that this requires that we shall look upon this land as restored to its original barren, unproven condition and attempt to value similar leases of such land. The petitioner is entitled to exhaust its assets as they stood on the basic date. Confusion of thought is avoided if we look upon the leaseholds in their improved and proven condition on March 1, 1913, realizing that petitioner is entitled to a deduction for the exhaustion of the value of the whole. What has been allowed is exhaustion of a part. That which we must value is the balance, and in so doing we must look to the conditions existing at the basic date.

In reaching our decision we have considered the elevation of the petitioner's lands and the greater cost of production on that account. On March 1, 1913, it had an investment of approximately $1,367,000 in wells, pumps, pumping machinery and buildings, reservoirs and other assets used in the irrigation system. It pumped its water to a mean elevation of 385 feet, an expensive matter. To develop its remaining lands and furnish a better supply to those under cultivation, it was engaged upon a project which committed it to spend approximately $2,500,000 further in developing its water supply. Because of the high cost of irrigation the owner of the leaseholds of the petitioner would not be in as good a position as many other plantations on the Islands to meet the increased competition and the decreased returns which would result should there be a tariff reduction. This was a factor which could not have been ignored by those interested in a sale or purchase of these leaseholds.

The petitioner's plantation was not on the market in 1913. It had earned substantial profits in the past and there was reason in 1913 to suppose that through a period of years, regardless of the prospect of decreased earnings in the immediate future, it would continue

to be a very profitable business. Its liabilities were small compared with what might be regarded as its current assets and it was in a position to continue its operation over a period of lean years, should they come. It is very evident that its managers had faith in its future and no intention of disposing of their property. When we come, however, to fix a fair market value we must consider another viewpoint than that of the owner; that of the purchaser. As we said in *James Couzens*, 11 B. T. A. 1040:

It has been said that value is the price at which a willing seller and a willing buyer would agree to trade if they both were aware of the facts. As to a completed transaction, this is a simple statement. But there is a great difference between finding value from an actual transaction and finding it by assuming from the circumstances a hypothetical transaction from which value is to be inferred. Here the problem is to determine as of a past date the fair market price or value of property the like of which was not involved at that time in any transaction, and as to which there was no willing seller or willing buyer and no direct evidence of the considerations which would actually have moved them to buy or sell such property. We have sought to place ourselves on March 1, 1913—recognizing all the facts in existence or in contemplation on that date as shown by the evidence, and from them attempting reasonably to predict those to come, being neither unduly skeptical nor unduly optimistic, we have sought to determine what an intelligent and reasonable seller and an intelligent and reasonable buyer would in their fairly mercenary interests have been most likely willingly to agree upon as a price for the property in question. Clearly opinions might differ as to such price. A common figure must be agreed upon.

In such circumstances as we have here there is room for such a great divergence of reasonable opinion upon value that considerable latitude must be allowed for the adjustments which would occur during negotiations. We must postulate the existence of a willing seller and a willing and able buyer, both familiar with the situation, reasonable in their views, acting for their own best interests and each willing to make such adjustments in his views upon value as might be necessary to bring about a sale at a reasonable amount, fair to both parties. It would be necessary to assume that so much of the plantation as was subject to these leaseholds was to be sold as a whole, that the parties were in agreement as to the value of the improvements upon the leaseholds, and that they were now seeking to fix a "bonus value" of the leases under which the land was occupied. The petitioner has submitted an appraisal of the leasehold value, based on the earnings of the five years preceding 1913 and providing for a return of 8 per cent on tangible assets and improvements on the leasehold and 12 per cent on the amount paid for the leasehold interest, all cost to be amortized over the life of the lease. Such an appraisal is helpful but by no means conclusive in arriving at a decision as to value. It represents an effort to incorporate the factors of valuation in a computation by formula. If

there be any error of judgment, the result is wrong. There are several such computations which might be made, all based upon the evidence in this proceeding, which arrive at substantially different results. None seems to be beyond criticism although each would seem worthy of some consideration by a prospective buyer or seller. In such circumstances as we have here, it seems to us that any conclusion based primarily upon a mathematical computation is unsatisfactory. There are too many considerations which may not be expressed in terms of mathematics, although their appeal to reason is such that they must be carefully considered in reaching a conclusion. We have derived from formulas what help seems possible but find none which we may say correctly reflects all the factors which must be considered.

We have already indicated the scope of the evidence and the relative weight which it seems to us should be attached to some of the more important factors. We have attempted to weigh the evidence as a whole in an effort to arrive at an impartial judgment of the amount which would represent a fair price upon which both seller and buyer might agree. It is our judgment that $950,000 would be the amount upon which such parties might be expected to reach an agreement which would be reasonable as to each of them. We have determined the fair market value of the leasehold interests at that amount. A reasonable allowance for the exhaustion of this amount over the life of the leases is properly allowable in computing taxable income. The amount to be allowed in 1920 can be arrived at with reasonable accuracy by considering the life of each lease with respect to its acreage and using the average as the basis for the exhaustion of this value.

Reviewed by the Board.

*Decision will be entered under Rule 50.*