NATIONAL WATER MAIN CLEANING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 12140. Promulgated April 26, 1929.

*A. E. James*, *Esq.*, and *Percy Block*, C. P. A., for the petitioner.
*John D. Foley*, *Esq.*, and *L. W. Creasson*, *Esq.*, for the respondent.

230

232

234

## OPINION.

STERNHAGEN: The petitioner contends that the deficiencies for 1918 and 1919 are barred by the statute of limitations because more than five years elapsed after the filing of the returns before the Commissioner's determination of deficiency. Petitioner argues that the consents or waivers introduced by respondent do not extend the period because they were signed without authority and do not bind petitioner and because they were not signed by the Commissioner himself and do not represent his consent as required by statute. The petitioner's repudiation of the consents is based on the idea that the restrictions upon corporate officers to bind the corporation in contract are applicable to their power to consent as provided under the revenue acts. In support of this it cites numerous decisions illustrating the extent of express authority and of apparent or implied authority of corporate officers in matters of contract. The statute very simply provides for an extension of time by "consent" and it is not necessary to consider whether such consent is to be treated or construed as a contract or hedged about with the legal rules governing contracts. *Loewer Realty Co.* v. *Anderson*, 31 Fed. (2d) 268. Being within the ordinary functions of the corporation, the power to consent under this general taxing statute was not required to be expressly conferred upon its general officers. But were it so required, we think the by-laws in evidence give the authority to the president and in his absence or disability to the vice president. Furthermore, if, as in contract, implied authority to bind the

corporation adversely could only be founded upon a benefit derived or some bilateral effect, there would seem to be ample foundation in the right given to petitioner to claim refund or credit conditioned upon the execution of such a waiver or consent.

We are also of opinion that the Commissioner was authorized to delegate the power to consent in writing to a subordinate, and that the written authorization in evidence was sufficient for that purpose. Petitioner argues that the authorization to sign the Commissioner's name covered only the mechanical act of signature and not the substantive act of consent. We think this view is strained beyond reason. The Commissioner treats the consent as his own and we see no reason to believe that he reserved the distinction between the mental act of consent and the written execution, or between a "waiver" and a "consent." *Greylock Mills* v. *Commissioner*, 31 Fed. (2d) 655.

We are of opinion that the period of limitations as extended had not expired when the notices of deficiency were mailed and that the deficiencies are not barred. *Joy Floral Co.*, 7 B. T. A. 800; *Lawrence Trust Co.*, 8 B. T. A. 984; *Farmers Feed Co.*, 10 B. T. A. 1069; *Chicago Railway Equipment Co.*, 13 B. T. A. 471; *Bradford Co.*, 14 B. T. A. 339; *Wells Brothers Co.*, 16 B. T. A. 79.

The reduction of invested capital by the amount of a tentative tax was improper. *L. S. Ayers & Co.*, 1 B. T. A. 1135; *Blair Lumber Co.* v. *Ragley*, 30 Fed. (2d) 683; *Commissioner* v. *Pittsburgh Knife & Forage Co.*, 30 Fed. (2d) 522.

The reduction of invested capital by the amount of taxes for prior years is correct. Revenue Act of 1926, section 1207; *Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

In respondent's determination of invested capital, $38,591.04 has been included as the value of patents and applications paid in for stock or shares. Petitioner admits that the evidence does not establish any greater value at the time of acquisition, and respondent is on this issue sustained.

The petitioner seeks the following additions to invested capital, apparently by way of increased earned surplus at the beginning of the taxable years:

General propaganda and educational expense paid and charged off from 1907 to 1910_____ $32,684.26
Patent expense paid to Rosell and charged off in 1907_____ 1,538.00
Patent expense paid to Kenyon & Kenyon and charged off in 1907__ 250.00
Organization expense paid to Greene and charged off in 1907_____ 597.45

35,069.71

The evidence does not establish that these amounts were part of petitioner's earned surplus at the beginning of the years in question,

and the respondent's determination is in this respect sustained. The so-called propaganda and educational expense was entirely charged off prior to 1910 as current expense. It can not be said as a matter of law, based upon the present opinions of petitioner's officers who testified, that such charge-off was entirely improper and that no part of such expenditures should have been made from current earnings. Like advertising, they are in the twilight zone of accounting and the description of their purpose as "propaganda" or "educational" is not sufficient to justify the Board in saying 20 years after the entry that it was incorrect and that it represented a capital investment; to say nothing of the assumption that such an expenditure of 1907 and those for legal and patent services continue in 1918 and 1919 to represent an asset appearing in earned surplus either as patents or as something more intangible like good will. See *Richmond Hosiery Mills* v. *Commissioner*, 6. B. T. A. 1247; aff'd., 29 Fed. (2d) 262; certiorari denied, 279 U. S. 844; 49 Sup. Ct. 265; *Northwestern Yeast Co.*, 5 B. T. A. 232; *Kress & Owen Co.*, 12 B. T. A. 991.

The next item in controversy is the deduction to which petitioner is entitled in each of the years in question under section 234 (a) (7), representing a reasonable allowance for exhaustion of patents. The issue is confined to the value on March 1, 1913, of petitioner's patents, to be used as the basis of the computation of the allowance. The other factors of computation are not in dispute.

The Commissioner, having, as heretofore stated, used for the purpose of determining invested capital the figure of $38,591.04 as the value of patents and patent applications paid in for stock or shares, has also determined this to be the value of petitioner's patents on March 1, 1913, and has on such basis determined the reasonable allowance for exhaustion to be $3,348.66 for 1918, $3,363.36 for 1919, and $3,372.18 for 1920. The petitioner attacks this as inadequate and has offered evidence intended to prove that the value on March 1, 1913, of its three basic patents issued in 1909 was $225,000; of the Muller patent issued in 1903 and purchased in 1912 for $4,986.50 was $5,000; and of its remaining patents owned on that date was $20,000; and that the respective annual exhaustion allowances are $16,446.70, $636.61, and $1,330.96, or an aggregate of something over $18,000.

For the purpose of proving the value as claimed on March 1, 1913, petitioner has given evidence to show the history of its business and its progress prior to and since March 1, 1913. From this it is clear that the Reeser, Whitney and Greenan patents of 1909 were important assets. It is also clear that this business and its earnings required in addition to its patents, a capable management and organization to conduct its promotion, exploitation, development and operation, and skilled officers and employees to supervise and carry on its

operations with the necessary equipment. Neither the patents alone nor the organization and equipment alone may be treated as separately responsible for the progress of the enterprise. It is not possible to infer from the evidence, and perhaps could not be satisfactorily established by any means, in what measure or upon what basis a segregation could be made of the values of the several factors. The insurmountable difficulty of the problem lies in the mystery of business success. Petitioner, recognizing the difficulty, says only that the value of $250,000 claimed for patents is amply justified by the evidence.

In determining value on March 1, 1913, it is obviously unsound to treat subsequent data as if they were known at that time. *Ithaca Trust Co.* v. *United States*, 279 U. S. 151. At any date the future can only affect value to the extent that it is reasonably and sensibly in contemplation. Human experience rarely follows with exactness its own expectations. We must determine " what it fairly may be believed that a purchaser in fair market conditions would have given for [the patents] in fact—not what [we] may think a purchaser would have been wise to give." *New York* v. *Sage*, 239 U. S. 57, 61. To take subsequent earnings as disclosing prior value would ignore the obvious factor of risk inherent in commercial values. The hypothetical willing seller and buyer, who are by judicial decree always dickering for price in the light of all the facts, can not be credited with knowing what the future will yield. Otherwise the owner with a successful future would ordinarily not sell, and without it could find no buyer; and thus the entire hypothesis of a voluntary transaction is destroyed and we are left without the prescribed judicial standard. It is the inability to know the future which gives play to the judgment of risk, and this in turn contributes an element of the value arrived at. The evidence to be considered consists of the historical facts prior to March 1, 1913, and reasonable prognostications on that date. *James Couzens*, 11 B. T. A. 1040; *Van Kannel Revolving Door Co.*, 11 B. T. A. 1209; *Oahu Sugar Co., Ltd.*, 13 B. T. A. 404; *Cuyahoga Mortgage Co.*, 14 B. T. A. 1.

Petitioner called a sanitary engineer to give an opinion of value in answer to a hypothetical question. The witness demonstrated qualifications to judge the effectiveness of petitioner's patented devices and cleaning methods. But his opinion as to monetary value of the patent on March 1, 1913, involved considerations and confusions which render it of slight weight. Clearly it lacks such authority as entitles it to be adopted by the Board as an expert judgment of value, and we give it only such weight as part of the entire evi-

dence as the witness's qualifications justify. *Van Kannel Revolving Door Co.*, 11 B. T. A. 1209.

It is necessary to have it understood that the problem here is not to determine the value of the business as a whole, such as would be involved in valuing all its capital stock, or the value of the intangible assets as a whole, including such assets as good will, in order to value its statutory invested capital. The business will go on after these patents expire, and hence it would be clearly unsound to impute to the patents the entire earning power of the business or to insist that earnings are all attributable to patent value. The problem is to ascertain from the evidence whether a greater value existed on March 1, 1913, as to depreciable patents than the $38,591.04 determined by respondent. Thus the evidence of past and probable earnings of the business, of cost of business promotion and development and of contacts with possible sources of new business, affecting as it does the progress and value of the entire enterprise, requires some reasonable evidence in addition to demonstrate how and to what extent it reflects patent value. The respondent does not dispute the primary facts and has allocated $38,591.04 to patents. It is not sufficient therefore for petitioner to show the general facts and figures and urge an arbitrary allocation of value. It must establish by a preponderance that respondent's valuation of these specific assets, separated from other tangible or intangible assets, is too low, and submit enough evidence to enable the Board reasonably to determine, either directly or by inference, the value to be substituted for it. This we think it has failed to do and, strictly considered, this failure alone would be fatal to petitioner's contention.

But we nevertheless examine the evidence freely to ascertain whether there is any substantial support for the value claimed or for any value greater than respondent's determination. The evidence of annual profits is used by petitioner to show an upward trend justifying a projected curve of steadily increasing earnings. We are not impressed that this is sound. The experience available on March 1, 1913, of the business as a whole was of widely varying uncertainty, the losses of which were substantially greater than the gains. No dividends could be or had been paid, and, outside of the arbitrary valuation of patents, the balance sheet showed as its most important asset, material and equipment of $23,386.

But suppose we omit reference to the losses of 1907, 1908, and 1910, and attribute them say to the infancy and establishment of the enterprise, and look at 1911 and 1912 as indicative of its stability. We find the following figures in evidence:

| Year | Field profits [1] | Operating profit | Net profit before patent deduction | Net profit |
|------|------------------|------------------|-----------------------------------|-----------|
| 1911 | $28, 560. 17 | [2] $30, 638. 31 | $7, 845. 75 | [2] $6, 249. 22 |
| 1912 | 29, 392. 92 | 29, 392. 92 | 8, 657. 40 | 6, 906. 09 |

[1] Includes rents and royalties.    [2] 14 months.

From this it would be highly speculative to infer that net profits would be more than those of 1912. The fact that petitioner was, on March 1, 1913, " in touch with " numerous municipalities by correspondence with the hope of securing new business can not be translated into an assurance of increased earnings. However clearly it may have enhanced the expectation of future business, there was no reasonably sound basis for measuring probable earnings.

We think that it is improper to value the patents by reference to the so-called " field " or " operating " profits alone before taking into account salaries, advertising, various administration expenses, rent or depreciation. The petitioner's business was primarily one of service in cleaning water mains. It was not selling patented articles. Personal service and skill in performance were essential, in addition to the ownership of the patents. To attribute the " field profits " to the patents alone would be contrary to this obvious fact.

After a full consideration of all the evidence, we are unable to conclude that the value on March 1, 1913, of all petitioner's patents was greater than the $38,591.04 determined by respondent, and we have therefore found the value to be as so determined. This should be used as the base of the computation to which the average life of all patents should be applied. *Union Metal Manufacturing Co.*, 4 B. T. A. 287.

The remaining claim of petitioner is that it is within section 327, Revenue Act of 1918, and that its tax should therefore be computed by the comparative method provided in section 328. This is based upon the alleged uncertainty of value of the patents, the fact that there were some tangibles acquired at organization so as to constitute a " mixed aggregate of tangibles and intangibles paid in for stock," the propaganda, education and development expense which should not have been charged off, and the small ratio of capital to income required for its specialized service. We are of opinion that all these circumstances taken together as they appear from the evidence are not in substance sufficient to bring the case within section 327.

The determination of respondent is sustained in all respects except that current earnings should not be reduced by a tentative tax.

*Judgment will be entered under Rule 50.*