MEDICAL-SURGICAL GROUP, INC., A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 68790. Filed February 16, 1960.

*Thomas A. Madden, Esq., Charles F. Osborn, Esq.,* and *Paul A. Wallace, Jr., Esq.,* for the petitioner.

*George E. Constable, Esq.,* for the respondent.

### OPINION.

DRENNEN, *Judge:* The taxes in controversy are personal holding company surtaxes. Respondent determined that petitioner was a personal holding company as defined by section 501(a), I.R.C. 1939, in each of the years 1947 through 1953 and determined deficiencies in personal holding company surtaxes as follows:

| Calendar year | Deficiency | Calendar year | Deficiency |
|---|---|---|---|
| 1947 | $2,329.78 | 1951 | $7,274.99 |
| 1948 | 6,394.08 | 1952 | 7,427.93 |
| 1949 | 6,167.58 | 1953 | 4,796.80 |
| 1950 | 6,346.59 | | |

Petitioner denies that it was a personal holding company in the years involved. The amounts are not in dispute.

The facts were all stipulated and the stipulation of facts with exhibits attached are incorporated herein by this reference.

Petitioner was, at all times involved, a corporation organized and existing under the laws of the State of Idaho with its principal office in Lewiston, Idaho. It was a cash basis taxpayer and filed its corporate income tax returns, Form 1120, for the calendar years 1947 to 1953, inclusive, in either the office of the then collector of internal revenue or the office of the district director of internal revenue at Boise, Idaho.

Petitioner was organized on April 6, 1946, with an authorized capital stock of $100,000 consisting of 1,000 shares of common stock having a par value of $100 per share. The corporation was formed for the purpose of constructing and operating a medical office building which would lease space to physicians and other tenants conducting businesses associated with the medical profession.

Petitioner was organized by a group made up of nine medical doctors and one doctor of dentistry, all of whom were licensed by the State of Idaho in their respective professions. By the close of the year 1947 all of petitioner's stock had been subscribed for by the 10 organizers, each of them having subscribed for 100 shares of stock. The stock ownership of petitioner remained unchanged during the taxable years in question.

The cost of constructing the building was financed by the capital contributions of the shareholders and by a $70,000 mortgage loan from the Idaho First National Bank.

During the years in question the income of the corporation was derived solely from the rental of space in its building, except for a small amount of interest income on unpaid stock subscriptions.

On July 1, 1947, eight of petitioner's medical doctor-shareholders formed a partnership under the name of "Medical-Surgical Group" for the purpose of establishing and operating a medical laboratory and an X-ray department in building space leased from petitioner. In 1948, the ninth medical doctor-shareholder was admitted to the partnership. The X-ray department was operated by one of the partners and the medical laboratory was operated by hired personnel. The services and facilities offered by the partnership were available both to the doctor-tenants of petitioner's building and to other doctors in the community.

During each of the taxable years in question the tenants of the building owned and operated by petitioner were as follows:

(a) The nine medical doctors each of whom rented separate space and engaged in the conduct of his individual practice.

(b) A drugstore known as Perkins Pharmacy, owned and operated by an individual who was not one of petitioner's shareholders.

(c) The partnership of petitioner's nine medical doctor-shareholders known as Medical-Surgical Group, engaged in operating a medical laboratory and also an X-ray department.

(d) Petitioner's one dental doctor-shareholder who was not a member of the partnership and who leased separate space and engaged in the practice of dentistry.

Rents received by petitioner from each tenant for each of the years in question, and petitioner's gross income for each of the years in question were as follows:

| Sources of income | 1947 | 1948 | 1949 | 1950 | 1951 | 1952 | 1953 |
|---|---|---|---|---|---|---|---|
| Rent: | | | | | | | |
| Perkins Pharmacy | $2,307.71 | $6,317.00 | $7,052.07 | $7,853.79 | $8,034.50 | $8,264.92 | $7,718.46 |
| Medical-Surgical Group | 1,392.00 | 2,784.00 | 2,784.00 | 2,784.00 | 2,784.00 | 2,784.00 | 2,784.00 |
| Dr. Jacobs | 1,467.00 | 1,872.00 | 1,872.00 | 1,992.00 | 2,052.00 | 2,052.00 | 2,052.00 |
| Dr. Worden | 1,551.00 | 2,016.00 | 2,016.00 | 2,136.00 | 2,196.00 | 2,196.00 | 2,196.00 |
| Dr. Petersen | 1,355.00 | 1,680.00 | 1,680.00 | 1,680.00 | 1,680.00 | 1,680.00 | 1,680.00 |
| Dr. Haury | 1,487.00 | 1,992.00 | 1,992.00 | 1,992.00 | 1,992.00 | 1,992.00 | 1,992.00 |
| Dr. McRoberts | 1,246.00 | 1,248.00 | 1,248.00 | 1,248.00 | 1,248.00 | 1,248.00 | 1,248.00 |
| Dr. Pierce | 1,468.00 | 1,872.00 | 1,872.00 | 1,872.00 | 1,872.00 | 1,872.00 | 1,872.00 |
| Dr. Scott | 1,480.00 | 1,980.00 | 1,980.00 | 1,980.00 | 1,980.00 | 1,980.00 | 1,980.00 |
| Dr. White | 1,354.00 | 1,680.00 | 1,680.00 | 1,680.00 | 1,680.00 | 1,680.00 | 1,680.00 |
| Dr. Stein | 283.00 | 1,698.00 | 1,698.00 | 1,698.00 | 1,698.00 | 1,698.00 | 1,698.00 |
| Dr. Douglas | 1,389.00 | 1,824.00 | 1,824.00 | 1,824.00 | 1,824.00 | 1,824.00 | 1,824.00 |
| Miscellaneous rent | 24.70 | | | | | | |
| Interest on unpaid stock subscriptions | 572.00 | 537.41 | 806.54 | 627.85 | 563.34 | 361.25 | 169.01 |
| Total | 17,376.41 | 27,500.41 | 28,504.61 | 29,367.64 | 29,603.84 | 29,632.17 | 28,893.47 |

The Medical-Surgical Group partnership purchased X-ray equipment, darkroom tanks and fixtures, and necessary office equipment. Employees in the X-ray department throughout the years involved included one registered technician, one student technician, and one secretary.

The nine medical doctor-shareholders of petitioner contributed their own individual laboratory equipment to the medical laboratory conducted by the Medical-Surgical Group partnership, and the partnership purchased additional equipment. Two full-time laboratory employees were employed by the partnership in the years involved, assisted from time to time by a technician for "replacement coverage."

Two of petitioner's medical doctor-shareholders specialized in eye, ear, nose, and throat work. During the years involved these two doctors conducted their practices with regard to eye examinations and prescriptions for eyeglasses as follows:

(a) During 1947 through 1953, if eyeglasses were not prescribed, a patient was billed only for the examination involved.

(b) During the years 1947 to June 1, 1950, when the doctors determined that a patient needed eyeglasses or new lenses, the procedure was as follows: The doctor examined the patient, prepared a prescription for the lenses, and after measuring the patient for the necessary frames and showing the patient a number of samples of frames, prepared an order for the frame. Either the patient, the doctor, or a person employed by the doctor took the lenses prescription and frame order to the American Optical Company located near the doctor's office in Lewiston, Idaho. The optical company ground the lenses and assembled the lenses and frame, and delivered the eyeglasses to the doctor. The patient again visited the doctor, who checked the lenses, adjusted the frame, and delivered the glasses to the patient. Periodically, the optical company billed each doctor for the frames and lenses, and the respective doctor paid such invoices. Each patient received a bill for his eye examination from his doctor and when eyeglasses or new lenses were needed, the bill included an amount for the eyeglasses or the lenses, which amount was in excess of the amount paid to the optical company by the doctor for the eyeglasses or new lenses.

(c) Beginning in June 1950 and through 1953, the doctors jointly hired technicians to grind lenses for them and to assemble frames and lenses. They made space available to the technicians in petitioner's building and the two doctors shared equally the expenses of the technicians, their rent and compensation. The respective doctor examined his patient and prepared a prescription for the lenses. The patient selected a frame and the technician ground the lenses and fitted the lenses to the frame. The patient again visited the doctor who checked the lenses, adjusted the frame, and delivered the glasses to the patient. Each patient received a bill for his eye examination from his doctor, and when eyeglasses or new lenses were needed, the patient's bill included an amount for the eyeglasses or the lenses, which amount was in excess of the total cost of the lenses and frames, and the cost of grinding the lenses and assembling the lenses and frames.

During the years involved, the cost of optical supplies constituted a substantial portion, although, in all instances except one, less than half, of the total expenses incurred by each of these doctors.

Section 501(a), I.R.C. 1939,[1] defines a personal holding company as a corporation (1) at least 80 per cent of whose gross income consists of personal holding company income and (2) more than 50 per cent in value of whose outstanding stock is owned by not more than five individuals. If a corporation meets these gross income and stock

---

[1] All references are to the 1939 Code unless otherwise noted.

ownership requirements, then section 500 of the Code prescribes that, in addition to all other corporate income taxes, there shall be levied a surtax on the corporation's undistributed personal holding company net income at the rate of 75 per cent on the first $2,000 thereof and at the rate of 85 per cent on the amount thereof in excess of $2,000.

Under section 503(a)(2) of the Code, for the purpose of determining whether the stock ownership requirement under section 501(a)(2) and section 502(f) is met, an individual is considered as owning the stock owned, directly or indirectly, by or for his family or by or for his partner. On brief, petitioner concedes that because of the partnership relationship existing between 9 of its 10 shareholders in Medical-Surgical Group, it met the stock ownership requirement of a personal holding company even though the partnership in question was merely incidental to the principal activities of the 9 shareholders involved.

Petitioner denies that it met the gross income requirements for a personal holding company.

"Personal holding company income" is defined in section 502 of the Code as consisting of:

(a) * * * interest * * *

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

(f) USE OF CORPORATION PROPERTY BY SHAREHOLDER.—Amounts received as compensation (however designated and from whomsoever received) for the use of, or right to use, property of the corporation in any case where, at any time during the taxable year, 25 per centum or more in value of the outstanding stock of the corporation is owned, directly or indirectly, by or for an individual entitled to the use of the property; whether such right is obtained directly from the corporation or by means of a sublease or other arrangement.

[Note: By acts of Congress, hereinafter discussed, section 502(f) is not applicable to rents received in the years here involved if such rents were received for use of the taxpayer's property by the lessee in the operation of a bona fide commercial, industrial, or mining enterprise.]

(g) RENTS.—Rents, unless constituting 50 per centum or more of the gross income. For the purposes of this subsection the term "rents" means compensation, however designated, for the use of, or right to use, property * * * but does not include amounts constituting personal holding company income under subsection (f).

Practically all of its gross income being rent, petitioner would not meet the gross income requirements for a personal holding company (by virtue of section 502(g)) except that the formation of the partnership brings into operation the stock attribution rules of section 503(a)(2). But, as petitioner acknowledges on brief, under section 503(a)(2) each of the nine partners would be deemed to own more than 25 per cent of petitioner's stock so that the rent paid by them, which admittedly was more than 50 per cent of petitioner's gross income, would be governed by section 502(f) rather than section 502(g) and would be personal holding company income, unless it is

excluded from the operation of section 502(f) by section 223 of the Revenue Act of 1950.

Thus the question is narrowed to whether the conduct of a medical practice constitutes a "commercial" enterprise within the meaning of section 223 of the Revenue Act of 1950 which provides:

Section 502(f) * * * shall not apply with respect to rents * * * if such rents were received for the use by the lessee, in the operation of a bona fide commercial, industrial, or mining enterprise, of property of the taxpayer.[2]

This case seems to be one of first impression, as we have found no cases defining the scope of section 223.

In the interpretation and construction of statutes, it is the Court's duty to ascertain and give effect to the intent of Congress from the language used, and where the language of the statute is susceptible of more than one meaning, resort may be had to the legislative history of the statute to determine the congressional intent. *Abbott* v. *Commissioner*, 258 F. 2d 537(C.A. 3), affirming 28 T.C. 795; Sutherland, Statutory Construction, sec. 5001 (3d ed. 1943).

The word "commercial" may have a number of different meanings. As said in *Mechanical Farm Equipment Distributors* v. *Porter*, 156 F. 2d 296 (C.A. 9): "The term 'commercial' may have a broad or narrow meaning, and in its broad meaning it encompasses all business activities." We do not think the language of section 223 itself makes clear just what Congress intended to include within the scope of the words "commercial" enterprise. Respondent claims that the words as used in this context must be narrowly construed to mean a "mercantile" enterprise. Petitioner argues that the statute, being remedial, must be broadly construed in the light of the relief sought to be granted and in such light the words were intended to encompass all bona fide business enterprises, including the professions.

A review of the legislative history of section 502(f) of the Code and of section 223 of the Revenue Act of 1950 convinces us that Congress intended the words "commercial * * * enterprise," as used in section 223, to be given a broad meaning and scope.

The personal holding company tax was first imposed in 1934 to prevent high-bracket taxpayers from saving tax by transferring investment-type income to a corporation where it would be taxed at lower rates and the balance would be retained by the corporation—the so-called "incorporated pocketbook." The imposition of a nearly confiscatory surtax on the retained portion of the corporate income was to encourage distribution of that income in the form of dividends which would be taxed to the stockholders at ordinary income tax rates.

---

[2] Section 223 of the Revenue Act of 1950 amended section 502(f) for taxable years ending after December 31, 1945, and before January 1, 1950. As a result of amendments by the Act of August 11, 1955 (Pub. L. 370, 84th Cong., 1st Sess., 69 Stat. 693), and the Act of February 11, 1958 (Pub. L. 85–319, 85th Cong., 2d Sess., 72 Stat. 4), section 223 is applicable to all years here under consideration.

Provisions corresponding to section 502(f) were first enacted in the Revenue Act of 1937. That the purpose of this legislation was to close what had developed as a major defect in the personal holding company provisions, namely, the failure to include certain rent as personal holding company income, is made clear by the House report on this measure wherein it was stated:

Since under existing law, this type of compensation is not now included for the purpose of determining whether the corporation meets the 80-percent test, the taxpayer may fix such compensation in an amount sufficient to bring its other investment income below the 80-percent test. It has been shown to the committee that this device has been employed by taxpayers who had incorporated their yachts, city residences, or country houses and had paid sufficient rent to give the corporations enough income from their service to take them out of present section 351. By including this type of income in the definition of personal holding company income, your committee removes this method of tax avoidance. [H. Rept. No. 1546, 75th Cong., 1st Sess., p. 6.]

It is apparent that section 502(f) was directed at the use of "rents" as a means of avoiding personal holding company status in order to build a tax shelter for dividends, interest, royalties, and other types of income within the definition of personal holding company income. Although Congress had only tax avoidance situations in mind, the language of section 502(f) was such as to apply as well to corporations which held title to business property for reasons other than tax avoidance. Thus in a number of cases, corporations renting property to their shareholders fell within the definition of a personal holding company as a result of section 502(f), regardless of the bona fides of the transactions involved and the absence of an intent to avoid taxes. See *Randolph Products Co.* v. *Manning*, 176 F. 2d 190 (C.A. 3); *Hatfried, Inc.* v. *Commissioner*, 162 F. 2d 628 (C.A. 3), affirming in part and reversing in part a Memorandum Opinion of this Court; *Fourth & Railroad Realty Co.*, 25 T.C. 458; *Amo Realty Co.*, 24 T.C. 812; *O. Falk's Department Store, Inc.*, 20 T.C. 56; and *Western Transmission Corporation*, 18 T.C. 818.

To remedy the unintended tax pitfall occasioned by section 502(f), section 223 was enacted as a part of the Revenue Act of 1950, the effect of which was to exempt from section 502(f) rents "received for the use by the lessee, in the operation of a bona fide commercial, industrial, or mining enterprise, of property of the taxpayer" for taxable years ending after 1945 and before 1950. That section 223 was intended to apply to all business uses of corporate property by a shareholder is supported by the following language contained in S. Rept. No. 2375, 81st Cong., 2d Sess., pp. 64–65:

If a closely held corporation receives most of its income from such sources as dividends, interest, certain rents, and royalties, indicating that the company is being used as an "incorporated pocketbook," it is designated for tax purposes as a personal holding company. Generally, such a company, in addition

to paying the regular corporate income taxes, is subjected to an additional penalty tax at the rate of 75 percent or 85 percent on its undistributed income.

Included in personal holding company income are amounts received for the use of the corporation's property where 25 percent or more of the stock in the corporation is held by the individual renting the corporate property. The attention of your committee has been called to examples where, through a set of fortuitous circumstances, corporations have become closely held and also have rented most of their assets for use in the operation of businesses to the individuals holding the stock of the companies. Thus, unwittingly the corporations have become personal holding companies and subject to the penalty tax.

While your committee recognizes that such arrangements could result in tax avoidance, and, therefore, does not permit such practices in the future, it believes that relief for past years should be given where such arrangements have been unwittingly entered into with no thought of tax avoidance. Thus, your committee's bill in section 226 [in Senate bill] limits the application of section 502(f) of the Code (defining personal holding company income) to eliminate, for taxable years ending after 1945 and before 1950, rents for the use of a corporation's property by persons holding 25 percent or more of the stock of the company where the property is used by such persons "* * * in the operation of a bona fide commercial, industrial, or mining enterprise * * *."

In 1955, Congress, in Pub. L. 370, extended the application of section 223 to cover the years 1950 to 1954. The House Ways and Means Committee, in its report on the proposed legislation, stated in part:

Included in personal holding company income under section 502(f) of the 1939 Code (sec. 543(a)(6) of the 1954 Code) are amounts received for the use of the corporation's property where 25 percent or more of the stock of the corporation is held by the individual renting the corporate property. However, the Revenue Act of 1950 provided an exception to this rule for taxable years ending after 1945 and before 1950. The exception provided that personal holding company income, despite this 25-percent rule, was not to include property leased by a corporation to an individual if he used the property in the operation of a bona fide commercial, industrial, or mining enterprise. The Senate Finance Committee's report on the Revenue Act of 1950 indicated that this exception to the general 25-percent rule was provided because—"* * * through a set of fortuitous circumstances, corporations have become closely held and also have rented most of their assets for use in the operation of businesses to the individuals holding the stock of the companies. Thus, unwittingly the corporations have become personal holding companies and subject to the penalty tax."

This same problem was recognized in the Internal Revenue Code of 1954 with respect to taxable years beginning after December 31, 1953, and ending after August 16, 1954. In this case, however, the exception to the 25-percent rule is expressed in somewhat different terms. For 1954 and subsequent years the 25-percent rule with respect to use of corporate property by a shareholder is to apply only to a corporation which has personal holding company income, wholly apart from rents or other compensation for the use of property, in excess of 10 percent of its gross income. The report of your committee on the Internal Revenue Code of 1954 indicates that this amendment is designed to take care of hardship cases which frequently arise where a corporation rents property to its principal stockholders. * * * [H. Rept. No. 1353, 84th Cong., 1st Sess., p. 2.]

From the above-quoted committee reports, it seems clear that the intention of Congress was to grant relief from section 502(f) in all cases where stockholders rented from a corporation for a bona fide business purpose. This interpretation is reinforced by the following language in the Senate Finance Committee report on the Internal Revenue Code of 1954:

Under present law cases of hardship frequently arise when a corporation rents property to its principal stockholders. Such rental income is treated as personal holding company income and the corporation may be subject to the penalty tax. *This provision was originally inserted in the law with respect to incorporated yachts and residence but has been applied in the case of many legitimate business enterprises.* The House and your committee have provided that such rental income is not to be treated as personal holding company income unless the corporation has other personal holding company income amounting to 10 percent or more of its total gross income. *In the absence of appreciable amounts of other investment income, rental income received from shareholders does not constitute a tax avoidance problem.* * * * [S. Rept. No. 1622, 83d Cong., 2d Sess., p. 74. Emphasis added.]

In the case before us, substantially all of petitioner's income is derived from rent from its stockholders, the stockholders' partnership, and one other tenant. Each tenant was engaged in income-producing activities and used the leased premises in furtherance of these income-producing activities. With the exception of a negligible amount of interest paid to petitioner each year on unpaid stock subscriptions, petitioner received no dividends, royalties, or gains from the sale of property, or personal holding company income of any sort for which it sought to set up a tax shelter. It appears that petitioner's situation is precisely the situation for which Congress sought to grant relief, as illustrated by this sentence from the above-quoted Senate Finance Committee report: "In the absence of appreciable amounts of other investment income, rental income received from shareholders does not constitute a tax avoidance problem."

Respondent contends that petitioner does not fall within the provisions of section 223 for several reasons, all of which are centered on the proposition that the term "commercial * * * enterprise" as used in section 223 should not be interpreted so broadly as to include the practice of medicine and the conduct of an X-ray department medical laboratory.

Respondent argues first that throughout the history of the personal holding company provisions Congress has demonstrated an intention to enact technical legislation that would be applied automatically and mechanically. Accordingly, it is urged that "commercial * * * enterprise" as used in section 223 should not be interpreted in other than its most technical sense.

Secondly, respondent contends that "commercial" enterprise must be narrowly construed under several well-established rules of statu-

tory construction. There is a presumption, he notes, that every word in a statute was intended to have a useful purpose, force, and effect. Also there is a presumption that no superfluous words were used by the Legislature. Since the phrase "bona fide commercial, industrial, or mining enterprise" is used, respondent continues, the word "commercial" must be interpreted as having the limited meaning as "mercantile" so that "industrial" and "mining" will have some purpose and effect.

Additionally, respondent contends that still another rule of statutory construction supports his interpretation of "commercial" enterprise, namely, that words in statutes should be interpreted, where possible, in their ordinary and everyday sense. Respondent believes that Congress intended "commercial * * * enterprise" to have the same definition as that given the word "commercial" in Webster's New Collegiate Dictionary (2d ed. 1958) : "Of or pertaining to commerce; mercantile; * * * Having financial profit as the primary aim * * *."

The practice of medicine, respondent argues, does not have financial profit as its primary aim.

Respondent's reliance upon various rules of statutory construction and his efforts to limit the meaning of the word "commercial" to "mercantile" are not persuasive to us. Rules of construction may be useful as guides but our basic duty is to determine what Congress intended. We agree that the personal holding company tax was intended to be applied automatically to any corporation clearly qualifying as such, but, being a penalty tax, we do not think it should be applied unless the corporation does clearly come within its terms. In our opinion Congress intended by the statute we must here construe, section 223, to eliminate from the definition of "personal holding company income" rental income received from 25 per cent stockholders for the use of the corporation's property as a place in which the stockholders conduct their businesses, professions, or other income-producing activities.

Respondent has pointed to nothing in the legislative history of section 502(f) of the Code or section 223 of the Revenue Act of 1950 which would indicate Congress intended to limit the meaning of the word "commercial" as used in section 223 to a "mercantile" use of the property. On the contrary, in our opinion the legislative history of these statutes and the committee reports as partially quoted above indicate a congressional intent to remove from the operation of section 502(f) all cases where the property rented was used for bona fide income-producing activities with no tax avoidance motives. We see no reason for excluding a professional practice from this category. We recognize that the term "commercial" in its most commonly ac-

cepted meaning refers to commerce and trade. But it is also used with reference to other business activities having the production of income as one of their primary aims. While to some the practice of medicine may not have the production of income as one of its primary aims, it would be ignoring realities to say that a doctor, or any professional man, does not in all good conscience have as one of his primary motives in practicing his profession the production of a livelihood for himself and his family. Indeed the Treasury itself has considered the conduct of a professional practice to be a "trade or business" within the meaning of the revenue laws. See sec. 1.162–6, Income Tax Regs. (I.R.C. 1954), and Regs. 111, sec. 29.23 (a)–5 (I.R.C. 1939).

To limit the scope of the word "commercial" as used in section 223 to "mercantile," as contended by respondent, would in our opinion partially defeat rather than effect the purpose of Congress in enacting this legislation. The committee reports referred to above clearly show that Congress was concerned with affording relief in the case of all legitimate business activities conducted by stockholders on the corporation's property, and not just to mercantile, industrial, and mining activities. Such an interpretation would exclude all businesses dealing in services, such as theaters, hotels, repairmen, hospitals, and countless others which are in common parlance considered to be business activities. Had Congress intended to limit the scope of the statute to rent from properties occupied by mercantile businesses, it would more likely have used the word "mercantile" instead of "commercial," which is susceptible of a much broader construction. In our opinion it is more reasonable to assume that Congress used the word "commercial" as a broad general term to include all income-producing business activities, including the professions, conducted within office buildings, stores, apartment houses, hotels, hospitals, and similar commercial-type structures, and used the words "industrial" and "mining" to make certain that business activities of that nature conducted in manufacturing plants and in the ground were also afforded the relief intended to be granted.[3]

Accordingly we hold that section 502(f) is not applicable to rents received by petitioner from its stockholders. Such rentals were not personal holding company income within the meaning of section 502(f) because the stockholders were engaged in a "bona fide commercial * * * enterprise" within the meaning of section 223, Revenue Act of 1950. Whether these rentals thereby become "rents" within the purview of section 502(g) or are simply excluded from personal

---

[3] In *United States* v. *Public Service Co. of Colorado,* 143 F. 2d 79 (C.A. 10), the court found that the word "commercial" as used in a statute taxing electric energy used for "domestic and commercial" purposes was intended to be used in its narrower sense. But the opinion recognizes that "[i]n the final analysis all business is commercial" and points up why the words "industrial" and "mining" may have been used with the word "commercial" in the statute before us to include all business activities.

holding company income by section 223 of the Revenue Act of 1950,[4] we need not decide because these rents constitute more than 50 per cent of petitioner's gross income, so in either event petitioner is not a personal holding company as defined by section 501(a) because less than 80 per cent of its gross income is "personal holding company income" as defined in section 502. Hence petitioner is not liable for the surtax on personal holding companies under section 500.

In view of the above conclusion we do not reach petitioner's alternative argument that more than 50 per cent of petitioner's gross income for each year was derived from rent within the scope of section 502(g), being the rents paid by the Perkins Pharmacy (not a stockholder), the dentist (a stockholder but not a partner), and the two stockholder-partners who specialized in eye, ear, nose, and throat work and who manufactured and sold lenses and frames for eyeglasses, which petitioner asserts would be a "bona fide commercial * * * enterprise" within the meaning of section 223 even if we had found the practice of medicine not to be.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

[4] See *320 East 47th Street Corp. v. Commissioner,* 243 F. 2d 894 (C.A. 2), reversing in part 26 T.C. 545.