PLEASANTON GRAVEL CO., SUCCESSOR IN INTEREST TO RIO GRAVEL, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22723–81.     Filed November 25, 1985.

*Dan L. Shehi,* for the petitioner.
*Thomas M. Rohall,* for the respondent.

KÖRNER, *Judge:* Respondent determined deficiencies in Federal income tax against Pleasanton Gravel Co., Successor in Interest to Rio Gravel, Inc. (hereinafter petitioner), as follows:

| Tax year ended | Deficiency |
| --- | --- |
| July 31, 1968 | $6,588 |
| July 31, 1969 | 13,498 |
| July 31, 1970 | 12,700 |
| July 31, 1971 | 17,233 |
| June 30, 1972 | 20,616 |

After concessions, the issues remaining for decision are: (1) Whether, for the taxable years ended July 31, 1968, through June 30, 1972, Rio Gravel, Inc., a corporation which was merged into petitioner, was a personal holding company subject to the personal holding company tax imposed by section 541;[1] and (2) whether respondent is barred from the assessment and collection of the deficiencies herein, due to the expiration of the applicable period of limitation.

This case was submitted to the Court under the provisions of Rule 122, upon a set of stipulated facts and exhibits. The stipulation of facts and joint exhibits attached thereto are incorporated herein by this reference and form the basis of our findings of fact.

FINDINGS OF FACT

At the time of filing its petition, petitioner was a California corporation with its principal office in Pleasanton, California. At all times herein pertinent, the stock of petitioner was owned by its president, George W. Jamieson. Rio Gravel, Inc. (hereinafter Rio Gravel), was a California corporation, the stock of which at all times herein relevant was owned by Jamieson Co., a partnership consisting of George W. Jamieson and George G. Jamieson. George G. Jamieson died on February 5, 1971, and his interest in Jamieson Co. was subsequently purchased by George W. Jamieson, who continued the business as a sole proprietorship. Thus, in effect, after the death of George G. Jamieson, the stock of Rio Gravel, as well as the stock of petitioner, was all owned by George W. Jamieson.

On January 1, 1959, Rio Gravel entered into an agreement[2] with Jamieson Co. concerning the removal of sand and gravel deposits from land owned by Rio Gravel. By this agreement Rio Gravel purported to "sell and grant to Buyer [Jamieson Co.] forever, all the rock, sand and gravel deposits in, on and under" property situated in the Township of Washington, in

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

[2] We note that the agreement between Rio Gravel and Jamieson Co. was not signed. We find, however, that the parties intended to enter the agreement, intended to sign it, and that the record indicates that the parties acted in accordance with the terms of the agreement. Furthermore, the validity of the agreement is not in issue.

Alameda County, California. Pertinent terms and conditions of the agreement were as follows:

1. Buyer shall have the right to operate upon the premises described in "Exhibit A" hereto such number of gravel pits and quarries as may be proper under approved quarrying procedures and to excavate and remove from the said premises such rock, sand and gravel as may be proper and profitable under good quarrying practices. * * *

\* \* \* \* \* \* \*

3. The Buyer shall pay to Seller for every ton of rock, sand or gravel removed by Buyer ten cents (.10¢) for each ton so removed until Buyer shall have removed three million tons. After Buyer has removed three million tons, the price to be paid by Buyer for each ton so removed will depend upon the average wholesale price in Washington Township, County of Alameda, State of California, during the month of removal for the materials so removed, but in no event shall Buyer pay less than five cents (.05 a ton for each ton of rock, gravel or sand removed from the premises described in "Exhibit A." Attached hereto as "Exhibit B" is a schedule setting forth the price that will be payable by Buyer for each ton of rock, gravel or sand removed in excess of three million tons (Column III) based on the base wholesale price per ton in Washington Township, County of Alameda, State of California, for rock and gravel (Column II) or sand (Column I).

Buyer shall deliver to Seller a report in writing showing the number of tons of gravel, rock and sand removed from said premises during the preceding month on or before the 15th day of the calendar month next succeeding the calendar month in which Buyer makes its first removal of gravel, rock or sand from said premises and shall deliver to Seller a like report on or before the 15th day of each calendar month thereafter that Buyer is conducting quarry operations on the premises, and Buyer shall pay to Seller a sum equal to the total purchase price for all gravel, rock and sand as shown in the report due on the 15th day of the preceding month.

4. If at any time during quarrying operations Buyer determines that rock, gravel and sand can no longer be profitably quarried and removed from the lands described in "Exhibit A" hereto, Buyer shall have the option to terminate this agreement upon sixty (60) days notice to Seller.

\* \* \* \* \* \* \*

6. Buyer may erect upon the lands particularly described in "Exhibit A" hereto such machinery, trackage and roads as it may deem necessary or convenient for the proper and economical operation of the gravel pits and quarries upon said premises. All of such machinery and trackage shall at all times be the property of Buyer and it may remove the same at any time prior to the termination of this agreement or within a period of sixty (60) days thereafter. Any such machinery and trackage not so removed by Buyer

within sixty (60) days after the termination of this agreement shall be deemed to be abandoned by Buyer and shall become the property of Seller.

\*   \*   \*   \*   \*   \*   \*

9. Buyer shall keep the lands described in "Exhibit A" free from any liens arising out of any work performed for, materials furnished to or obligations incurred by Buyer.

10. Buyer shall, at its sole cost and expense, comply with all the requirements of all Municipal, State and Federal authorities now in force or which hereafter may be in force pertaining to its operations upon said premises, and shall faithfully observe in its operations on said premises all Municipal ordinances and State and federal statutes now in force or which may hereafter be in force. \* \* \*

\*   \*   \*   \*   \*   \*   \*

In the event that the base wholesale price for sand shall exceed $6.50 per ton, and in the event that the base wholesale price for rock or gravel shall exceed $6.40 per ton, then the purchase price to be paid by Buyer to Seller shall increase one cent (.01¢) per ton for each full twenty cents (.20¢) that the base wholesale price exceeds $6.50 per ton for sand and $6.40 per ton for rock and gravel.[3]

Rio Gravel's primary source of income during the years in issue was the proceeds received from Jamieson Co., pursuant to their agreement.

On July 11, 1972, Rio Gravel merged into petitioner, with petitioner being the surviving corporation. The agreement of merger provided (among other provisions):

Upon such merger the separate corporate existence of Rio Gravel, Inc. shall cease and the surviving corporation shall become the owner, without other transfer, of all the rights and property of the constituted corporation, and the surviving corporation shall become subject to all debts and liabilities of the constituent corporations in the same manner as if the surviving corporation had itself incurred them.

---

[3]Respondent introduced into evidence a contract dated Jan. 1, 1959, between Pleasanton Gravel Co. and Jamieson Co. for the removal of sand and gravel. Petitioner objected to this evidence on the grounds of relevancy. As we indicate in the text, *infra*, we feel that because the terms of the Pleasanton Gravel Co.-Jamieson Co. contract were substantially similar to the terms of the Rio Gravel-Jamieson Co. contract, the former is relevant to the extent it guides us in determining the nature of the payments therein. In the interests of judicial economy, we have not set forth the pertinent provisions of the Pleasanton Gravel Co.-Jamieson Co. contract because they appear in *Pleasanton Gravel Co. v. Commissioner*, 64 T.C. 510, 512–513 (1975), affd. per curiam 578 F.2d 827 (9th Cir. 1978), cert. denied 439 U.S. 1071 (1979).

The merger agreement did not specifically authorize the directors or officers of the surviving corporation to sign consents to extend the period of limitation on assessment of Federal tax deficiencies, nor did the agreement prohibit them from doing so.

The deficiencies in the present case relate to tax returns filed by Rio Gravel prior to the merger. For each of the taxable years ended July 31, 1968, July 31, 1969, July 31, 1970, July 31, 1971, and June 30, 1972 (final return), Rio Gravel timely filed a Federal Corporation Income Tax Return, Form 1120. On none of those returns did it indicate in the space provided that it was a personal holding company. Although the name and address of the shareholder were provided in an attachment to each of the returns, Rio Gravel did not provide any schedules enumerating the items of gross income and adjusted ordinary gross income. On each of the returns, Rio Gravel described the payments it received from Jamieson Co. as "royalties."

A Form 872A (Special Consent Fixing Period of Limitation Upon Assessment of Income Tax) was executed by the parties on July 16, 1974, and covered each of the taxable years in issue. The Form 872A named Pleasanton Gravel, Inc., Successor in Interest to Rio Gravel, Inc., as the taxpayer, was signed by G.W. Jamieson in his capacity as president of Pleasanton Gravel Co., and purportedly extended the period of limitation on assessment to December 31, 1976. Forms 872 (Consents Fixing Period of Limitation Upon Assessment of Income Tax) covering the same years mentioned above, were executed by the parties on September 16, 1974, October 1, 1976, September 19, 1978, and December 4, 1979, respectively. These also named Pleasanton Gravel Co., Successor in Interest to Rio Gravel, Inc., as the taxpayer, were signed by G. W. Jamieson in his capacity as president of Pleasanton Gravel Co., and purportedly extended the period of limitation on assessment to December 31, 1976, December 31, 1978, December 31, 1979, and June 30, 1981, respectively.

On June 4, 1981, respondent issued a statutory notice of deficiency to Pleasanton Gravel Co., Successor in Interest to Rio Gravel, Inc., determining that for each of the years in issue, Rio Gravel was a personal holding company, and as

such, was subject to the personal holding company tax in the above-mentioned amounts.

## OPINION

The first issue for decision is whether, for the taxable years ending July 31, 1968, through June 30, 1972, Rio Gravel was a personal holding company. If so, then the parties have stipulated it was subject to the 70-percent tax imposed by section 541 on its undistributed personal holding company income in the amounts determined by respondent to be the deficiencies for the years in issue.

As it read during the years in issue, section 542(a) defined a "personal holding company" to include any corporation satisfying the following requirements:

(1) ADJUSTED ORDINARY GROSS INCOME REQUIREMENT.—At least 60 percent of its adjusted ordinary gross income (as defined in section 543(b)(2)) for the taxable year is personal holding company income (as defined in section 543(a)), and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned directly or indirectly, by or for not more than 5 individuals. * * *

The parties have stipulated that Rio Gravel satisfied the stock ownership requirement during each of the relevant years. They disagree, however, as to whether Rio Gravel also met the first test relating to the composition of its "adjusted ordinary gross income."

It is not necessary for us to trace our way through the various complicated statutory provisions defining "adjusted ordinary gross income," for there is no dispute between the parties as to their application here at each step of the way. For our purposes, it is sufficient to state that in order to satisfy the adjusted ordinary gross income requirement, it is necessary to have the requisite amount of "personal holding company income" as defined in section 543(a). It is agreed by the parties that unless the payments received by Rio Gravel from Jamieson Co. were properly excluded from personal holding company income under section 543(a)(6), then the required amount of personal holding company income was present, and thus the adjusted ordinary gross income requirement of section 542(a)(1) was satisfied. We therefore proceed directly to the

crucial issue of whether respondent correctly refused to exclude these payments from classification under section 543(a)(6).

As it read during the years in issue, the pertinent provisions of section 543(a) provided:

SEC. 543(a). GENERAL RULE.—For purposes of this subtitle, the term "personal holding company income" means the portion of the adjusted ordinary gross income which consists of:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(6) USE OF CORPORATION PROPERTY BY SHAREHOLDER.—Amounts received as compensation (however designated and from whomsoever received) for the use of, or right to use, property of the corporation in any case where, at any time during the taxable year, 25 percent or more in value of the outstanding stock of the corporation is owned, directly or indirectly, by or for an individual entitled to the use of the property; whether such right is obtained directly from the corporation or by means of a sublease or other arrangement. This paragraph shall apply only to a corporation which has personal holding company income for the taxable year (computed without regard to this paragraph and paragraph (2), and computed by including as personal holding company income copyright royalties and the adjusted income from mineral, oil, and gas royalties) in excess of 10 percent of its ordinary gross income.

It is petitioner's primary contention that the second sentence of section 543(a)(6) means that if a corporation receives, *from other than its shareholders*, as little as 10 percent plus $1 of its ordinary gross income as mineral royalties, then all of the amounts received from its shareholders constitute personal holding company income. Here, however, except in 1972, Rio Gravel had no income, other than the payments received from its shareholder, Jamieson Co. Thus, because there was no income, other than from shareholders, the 10-percent test in the second sentence of section 543(a)(6) was not met, petitioner argues, and accordingly Rio Gravel did not have any personal holding company income. In so arguing, petitioner assumes, as it must, that the payments by Jamieson Co. to Rio Gravel, were otherwise classifiable under the first sentence of section 543(a)(6).

Respondent contends that the payments in issue should not be excluded under section 543(a)(6). He contends that the payments should have been classified under section 543(a)(3) as mineral royalties, and as such, the requisite amount of

personal holding company income was present for purposes of section 542(a)(1).

The resolution of this controversy thus requires us to determine the breadth of the phrase "compensation (however designated and from whomsoever received) for the use of, or the right to use, property of the corporation" as it is employed in the first sentence of section 543(a)(6).[4]

In the interpretation and construction of statutes, it is our duty to ascertain and give effect to the intent of Congress from the language of the statute. If such language is susceptible of more than one meaning, resort may be had to the legislative history of the statute to determine the congressional intent. *Huntsberry v. Commissioner,* 83 T.C. 742, 747–748 (1984); *Abbott v. Commissioner,* 258 F.2d 537, 543 (3d Cir. 1958), affg. 28 T.C. 795 (1957); *Medical-Surgical Group, Inc. v. Commissioner,* 33 T.C. 888, 893 (1960).

We do not think that the language of section 543(a)(6), itself, clearly indicates what Congress intended to include within the scope of the phrase "compensation (however designated and from whomsoever received) for the use of, or the right to use property of the corporation." Respondent claims that the words as used in this context must be narrowly construed to mean "rent." Petitioner apparently argues that the words were intended to encompass all payments made by a shareholder to a corporation.

A review of the legislative history of section 543(a)(6) convinces us that Congress intended the phrase to apply only to "rents."

Provisions corresponding to section 543(a)(6) were first enacted in the Revenue Act of 1937. The purpose of this legislation was to close what had developed as a major defect in the personal holding company provisions, namely the failure to include certain *rent* as personal holding company income. This is made clear in the House report on this measure, wherein it was stated:

Since under existing law, this type of compensation is not now included for the purpose of determining whether the corporation meets the 80 percent test, the taxpayer may fix such compensation in an amount sufficient to

---

[4]For commentary on this subject see Morgan, "The Domestic Technology Base Company: The Dilemma of an Operating Company Which Might Be a Personal Holding Company," 33 Tax L. Rev. 233, 267–271 (1978).

bring its other investment income below the 80-percent test. It has been shown to the committee that this device has been employed by taxpayers who had incorporated their yachts, city residences, or country houses and had paid sufficient *rent* to give the corporations enough income from their service to take them out of present section 351. By including this type of income in the definition of personal holding company income, your committee removes this method of tax avoidance. [H. Rept. 1546, 75th Cong., 1st Sess. 6 (1937), 1939–1 C.B. (Part 2) 707–708 (emphasis added). See also S. Rept. 1242, 75th Cong., 1st Sess. (1937), 1937–2 C.B. 609, 613; H. Doc. 337, 75th Cong., 1st Sess. 6 (1937).]

It is apparent that section 543(a)(6) was directed at the use of "rents" as a means of avoiding personal holding company status in order to build a tax shelter for other types of income within the definition of personal holding company income.

Problems developed when corporations renting property to their shareholders were caught within the web of the personal holding company tax, regardless of the bona fides of the transactions involved and the absence of an intent to avoid taxes. See, e.g., *Randolph Products Co. v. Manning*, 176 F.2d 190 (3d Cir. 1949). Thus, as part of the Revenue Act of 1950, section 543(a)(6) was amended to exempt from said section rents "received for the use by the lessee, in the operation of a bona fide commercial, industrial, or mining enterprise of property of the taxpayer." Again, the focus by the legislature was on "rents," which is supported by the following language contained in S. Rept. 2375, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 557:

section 502(f) [the predecessor to section 543(a)(6)] of the Code shall not apply with respect to *rents* received during the taxable years ending after December 31, 1945, and prior to January 1, 1950 if such *rents* were received for the use by the lessee in the operation of a bona fide commercial, industrial, or mining enterprise, of property of the taxpayer. [Emphasis added. See also S. Rept. 2375, *supra* at 530.]

In 1955, Congress, in Public Law 370, extended the application of section 543(a)(6) to cover the years 1950 to 1954. The House Ways and Means Committee reiterated that the 1950 amendment was "designed to take care of hardship cases which frequently arise where a corporation *rents* property to its principal stockholders." H. Rept. 1353, 84th Cong., 1st Sess. (1955), 1955–2 C.B. 845. (Emphasis added.)

From the above-quoted committee reports, it seems clear that in enacting section 543(a)(6) Congress was primarily concerned with payments by shareholders for the rental of corporate property. This interpretation is reinforced by the following language in the Senate Finance Committee report on the Internal Revenue Code of 1954:

> Subsection (a)(6), *relating to the inclusion in personal holding company income of rental income received from corporate shareholders*, is qualified to limit application of the paragraph to cases in which the corporation has other personal holding company income in excess of 10 percent of its gross income. * * * [S. Rept. 1622, 83d Cong., 2d Sess. 319 (1954) (emphasis added). See also S. Rept. 1622, *supra* at 74; H. Rept. 1337, 83d Cong., 2d Sess. 56 (1954).]

We find additional support for this proposition in *Montgomery Coca-Cola Bottling Co. v. United States*, 206 Ct. Cl. 864, 865 (1975),[5] where in a summary judgment proceeding the Court of Claims indicated:

> The legislative background of section 543(a)(6) and its predecessor sections show that the phrase "compensation * * * for the use of, or the right to use" as it is employed in the first sentence of section 543(a)(6) was only intended to apply to amounts received by the corporation as *rental* income. The first sentence of section 543(a)(6) does not include royalty income, and there is no indication that Congress intended royalties to be treated as rents in this instance. [Emphasis in original. Citations omitted.]

It is therefore apparent that "compensation (however designated and from whomsoever received) for the use of, or the right to use property of the corporation" refers exclusively to "rents." Thus, for petitioner to prevail on this issue, it must show that the payments in question constituted rent. If, however, as respondent contends, the payments constituted royalties, then we must decide this issue in favor of respondent.

---

[5]Petitioner contends that *Montgomery Coca-Cola bottling Co. v. United States*, 206 Ct. Cl. 864 (1975), is not applicable to the facts here because three of the four courts (see also *Montgomery Coca-Cola Bottling Co. v. United States*, 615 F.2d 1318 (Ct. Cl. 1980); *Dothan Coca-Cola Bottling Co. v. United States*, 561 F. Supp. 1261 (M.D. Ala. 1982), affd. 745 F.2d 1400 (11th Cir. 1984)), reviewing the issue involved in that case agreed that royalties constituted rent within the meaning of sec. 543(a)(6). We do not agree with this statement. The only court which reached the narrow issue of whether royalties constituted rents for purposes of sec. 543(a)(6), indicated that they did not. *Montgomery Coca-Cola Bottling Co. v. United States*, 206 Ct. Cl. at 865. The remaining courts did not address this issue, but were concerned with whether the payments involved therein constituted rents or royalties and the standard of review to be applied.

The Code, the regulations, and the legislative history do not clearly delineate the difference between rents and royalties. See *Johnson Investment & Rental Co. v. Commissioner*, 70 T.C. 895, 900 (1978). We must therefore look to the courts which have passed on this issue for guidance.[6] In *Logan Coal & Timber Association v. Commissioner*, 122 F.2d 848, 850 (3d Cir. 1941), affg. 42 B.T.A. 529 (1940), the Third Circuit said that the difference between rents and royalties for purposes of the personal holding company provisions is:

the commonly accepted one that rent is a compensation for the right to use property which is fixed and certain in amount and payable periodically over a fixed period regardless of the extent of the use of the property, while royalty is a compensation for the use of property which is based as to amount entirely upon the use actually made of the property. * * * [Fn. refs. omitted.]

The courts have adhered to this same basic distinction between rents and royalties on numerous occasions. *Johnson Investment & Rental Co. v. Commissioner, supra* at 901; *Warren Browne, Inc. v. Commissioner*, 14 T.C. 1056, 1063 (1950); *U.S. Universal Joints Co. v. Commissioner*, 46 B.T.A. 111, 115–116 (1942); *Kiesau Petroleum Corp. v. Commissioner*, 42 B.T.A. 69, 75–77 (1940); see also *Anderson v. Helvering*, 310 U.S. 404, 409 (1940); *Bayou Verret Land Co. v. Commissioner*, 450 F.2d 850, 853–855 (5th Cir. 1971), affg. on this issue 52 T.C. 971 (1969); *Campbell v. Great National Life Insurance Co.*, 219 F.2d 693, 695–696 (5th Cir. 1955).

When we apply the above standard to the payments from Jamieson Co. to Rio Gravel, there can be no doubt that such payments were royalties. Although the parties adopted the language of an outright sale in one portion of their agreement, this was merely a preliminary statement which was contradicted by other provisions therein. The heart of their arrangement was contained in the terms of paragraph 3, where they provided that Jamieson Co. was to pay Rio Gravel a specified amount for each ton of rock, sand, or gravel removed. This was

---

[6]We note in passing that in distinguishing between rents and royalties for purposes of the personal holding company provisions as well as other provisions of the Code, the courts have uniformly held that since the issue is one of interpreting a Federal statute, they are guided by the meaning intended by Congress rather than State law. *Johnson Investment & Rental Co. v. Commissioner*, 70 T.C 895, 901–902 (1978); *Webster Corp. v. Commissioner*, 25 T.C. 55, 60–61 (1955), affd. per curiam 240 F.2d 164 (2d Cir. 1957); *Western Transmission Corp. v. Commissioner*, 18 T.C. 818, 822–823 (1952).

the only consideration for the sand and gravel. The payments were not fixed and certain in amount, but rather, such payments were tied directly to the amount of rock, sand, or gravel that was quarried. As the quantity of rock extracted by Rio Gravel increased, so did the payments by Jamieson Co. It is also noteworthy that petitioner characterized the payments as royalties in the returns in issue.

It is true that Jamieson Co. acquired the right to possession of the land owned by Rio Gravel, but those possessory rights were merely incidental to the quarrying of the stone. See *Johnson Investment & Rental Co. v. Commissioner*, 70 T.C. at 902; *Logan Coal & Timber Association v. Commissioner*, 42 B.T.A. at 537. The critical distinction is that Jamieson Co. paid a fee which varied with the quantity of minerals removed.

We find additional support in *Pleasanton Gravel Co. v. Commissioner*, 64 T.C. 510 (1975), affd. per curiam 578 F.2d 827 (9th Cir. 1978), cert. denied 439 U.S. 1071 (1979), where we held that an almost identical agreement between petitioner and Jamieson Co. consituted a contract for royalty payments rather than a contract for the sale of its interest in the property involved.

For the above-stated reasons, we feel that the payments from Jamieson Co. to Rio Gravel constituted royalties rather than payments for rent, and thus were not properly classifiable under the first sentence of section 543(a)(6).[7]

Petitioner alternatively argues that even if the payments were not properly classifiable under section 543(a)(6), they were properly classifiable under section 543(a)(2), the provision for rents. As we have indicated *supra*, the payments constituted royalties, not rents, and as such, because the payments were for rock, sand, or gravel, they were properly classifiable under section 543(a)(3), the provision for mineral royalties. Petitioner, however, contends that section 543(b)(3), the definitional section for adjusted income from rents, requires us to reach a different result. Section 543(b)(3) provides:

(3) ADJUSTED INCOME FROM RENTS.—The term "adjusted income from rents" means the gross income from rents, reduced by the amount subtracted under paragraph (2)(A) of this subsection. For purposes of the

---

[7]Since we find that there has been a failure of compliance with the first sentence of sec. 543(a)(6), it is unnecessary to consider petitioner's contention in respect of alleged compliance with the second sentence of sec. 543(a)(6).

preceding sentence, the term "rents" means compensation, however designated, for the use of, or right to use, property, and the interest on debts owed to the corporation, to the extent such debts represent the price for which real property held primarily for sale to customers in the ordinary course of its trade or business was sold or exchanged by the corporation; but such term does not include—

    (A) amounts constituting personal holding company income under subsection (a)(6),

    (B) copyright royalties (as defined in subsection (a)(4)),

    (C) produced film rents (as defined in subsection (a)(5)(B)), or

    (D) compensation, however designated, for the use of, or the right to use, any tangible personal property manufactured or produced by the taxpayer, if during the taxable year the taxpayer is engaged in substantial manufacturing or production of tangible personal property of the same type.

Petitioner submits that because section 543(b)(3) does not contain a specific exclusion for mineral royalties (as it does, for example, for copyright royalties) that Congress intended to include mineral royalties within the definition of rents in section 543(b)(3). We disagree. Congress specifically provided a definitional provision for adjusted income from mineral royalties in section 543(b)(4). If we were to interpret section 543(b)(3) so as to include mineral royalties within the definition of rent, then section 543(b)(4) would be unnecessary, a result Congress clearly did not intend. It is a well-accepted rule of statutory construction that the various sections of the Code should be construed so that one section will explain and support and not defeat or destroy another section. *Crane v. Commissioner*, 331 U.S. 1, 13 (1947); *Bernier v. Bernier*, 147 U.S. 242, 246 (1893); *Brons Hotels, Inc. v. Commissioner*, 34 B.T.A. 376, 381 (1936).

In sum, we hold that payments in issue were mineral royalties, and thus properly classifiable under section 543(a)(3). The parties are in agreement that if the payments are classified under section 543(a)(3) then the requisite amount of personal holding company income was present. Respondent properly characterized Rio Gravel as a personal holding company.

The second issue for decision is whether respondent is barred from the assessment and collection of the deficiencies herein, due to the expiration of the applicable period of limitation, as pleaded by petitioner.

Section 6501(f) provides that if a corporation which is a personal holding company fails to file with its return a

schedule setting forth the items of gross income and adjusted ordinary gross income, and the names and addresses of its stockholders owning more than 50 percent of the outstanding stock, then respondent has 6 years after the taxpayer's return is filed within which to commence statutory proceedings for assessment and collection of tax by the mailing of a deficiency notice. We have already determined that Rio Grande is a personal holding company; therefore, because Rio Grande failed to attach a schedule enumerating the items of gross income and adjusted ordinary gross income, the 6-year statute is applicable.[8]

Rio Gravel's income tax returns for the fiscal years ending July 31, 1968, through June 30, 1972, were timely filed with respondent; consequently, the 6-year statute of limitations under section 6501(f) for these years would have expired, respectively, on October 15, 1974, October 15, 1975, October 15, 1976, October 15, 1977, and September 15, 1978.

Section 6501(c)(4) allows the prescribed statute of limitations to be extended by agreement between the parties, so long as such consent is executed while the statute of limitations is still open. In the absence of valid consents, however, the period of limitation on assessment and collection against Rio Gravel would have expired on September 15, 1978. The notice of deficiency mailed on June 4, 1981, would thus be untimely.

Here, numerous consecutive consents were executed for the returns in issue, extending the period of assessment and collection for those years, until, ultimately, June 30, 1981. As shown in our findings, each was executed while the statute of limitations was still open. Accordingly, the resolution of the

---

[8]Petitioner apparently contends that sec. 6501(f) is inapplicable because all of the information sought therein was contained in Rio Gravel's returns, albeit not on a separate schedule. This argument was previously dealt with in *Pleasanton Gravel Co. v. Commissioner*, 64 T.C. 510, 527 (1975), affd. 578 F.2d 827 (9th Cir. 1978), cert. denied 439 U.S. 1071 (1979), where we indicated to the same petitioner as is involved in the instant case, that it is insufficient to receive the information in some form, but rather, it must be provided in a uniform manner so that the physical task of handling and verifying returns may be readily accomplished.

Petitioner argues that *Pleasanton Gravel* is distinguishable because if, as was the case here, the personal holding company box on Form 1120 is not checked, then no special procedures to test for personal holding company income are performed by respondent, and therefore it is unnecessary to attach a separate schedule. We do not believe that this argument provides any basis for distinguishing *Pleasanton Gravel*. To the contrary, the reason no special procedures are performed by respondent in such a situation is because the taxpayer has effectively disguised, or at least failed to reveal, the fact that it is a personal holding company.

issue involved herein turns on whether the consents extending the statute of limitations were validly executed.

Petitioner initially contends that no one had the authority to act on behalf of Rio Gravel in executing the waivers, since Rio Gravel had ceased to exist after it merged into petitioner. Respondent, on the other hand, contends that the consents were validly executed by petitioner as successor in interest to Rio Gravel.

The parties are in agreement that the validity of the consents (at least with respect to petitioner's *capacity* to execute) is to be determined under the laws of the State of California, where they were executed. See *Lesser v. Commissioner*, 47 T.C. 564, 591 (1967); see also *United States v. Krueger*, 121 F.2d 842 (3d Cir. 1941); *Sanderling, Inc. v. Commissioner*, 66 T.C. 743, 750 (1976), affd. on this issue 571 F.2d 174 (3d Cir. 1978).

The provisions of the California Corporation Code (West 1977) pertinent to this case are set forth in the footnote below.[9] Under these provisions, the separate existence of Rio Gravel ceased when all of the requisite formalities of the merger had been completed, at which time petitioner, as the surviving corporation, took all of the *rights* and assumed all of the *obligations* of Rio Gravel as its own. The agreement of merger herein contained similar language.

It has been held that taxes are debts or liabilities. See *United States v. Scott*, 167 F.2d 301 (8th Cir. 1948). It follows that petitioner, who became primarily liable for the tax liabilities of Rio Gravel after the merger under California law, had the power under State law to extend the period of limitation for its own direct liability, just as its predecessor, Rio Gravel, would have had. See and compare *Union Bleachery v. Commissioner*, 97 F. 2d 226, 228 (4th Cir. 1938), affg. a Memorandum Opinion of this Court; *Phillips v. Lyman H. Howe Films Co.*, 33 F.2d 891 (3d Cir. 1929); *Popular Library, Inc. v. Commissioner*, 39 T.C. 1092 (1963).

---

[9]Sec. 1107 Effect of merger; rights of creditors; liens; pending actions or proceedings

(a) Upon merger pursuant to this chapter the separate existence of the disappearing corporations ceases and the surviving corporation shall succeed, without other transfer, to all the rights and property of each of the disappearing corporations and shall be subject to all the debts and liabilities of each in the same manner as if the surviving corporation had itself incurred them.

Petitioner argues that the Form 872 purporting to extend the statute of limitations to December 31, 1978, was not valid because the corporation's name did not appear next to the signature of G.W. Jamieson. The last paragraph of the instructions on the Form 872 in issue instructs "If the taxpayer is a corporation, this consent must be signed with the corporate name followed by the signature and title of the officer(s) authorized to sign." Here, the form was addressed to "Pleasanton Gravel Co., Successor in Interest to Rio Gravel, Inc." and was signed "G.W. Jamieson Pres," thus it was unnecessary for the corporate name to appear again beside Mr. Jamieson's signature. Moreover, the other four consents all listed the corporation's name next to his signature. We therefore agree with respondent that this mere clerical error does not invalidate an otherwise proper waiver. See *Lefebvre v. Commissioner*, T.C. Memo. 1984–202, affd. per curiam 758 F. 2d 1340 (9th Cir. 1985); *Illinois Addressograph Manufacturing Co. v. Commissioner*, 31 B.T.A. 498 (1934); *Rauh v. Commissioner*, 22 B.T.A. 662 (1931). See also *William S. Dorg, Inc. v. Commissioner*, 13 B.T.A. 256 (1928) (waiver signed by corporate officer was binding despite absence of corporate seal).

It is urged by petitioner that pursuant to *Lesser v. Commissioner*, 47 T.C. at 591, the burden of proof is on respondent to show that G.W. Jamieson was authorized to sign the consent. We agree that when respondent relies on the exception to the running of the period of limitation provided by section 6501(c)(4), he bears the burden of showing the necessary waivers. However, waivers valid on their face and introduced into evidence by respondent shift the burden of going forward with the evidence back to petitioner, upon whom the burden of proof on the statute of limitations issue lies, to show invalid execution. *Concrete Engineering Co. v. Commissioner*, 19 B.T.A 212 (1930), affd. 58 F.2d 566 (8th Cir. 1932); *Stern Bros. & Co. v. Burnet*, 51 F.2d 1042 (8th Cir. 1931), affg. 17 B.T.A. 848 (1929); *Adler v. Commissioner*, 85 T.C. 535 (1985); *Lefebvre v. Commissioner, supra.*[10]

Here the consents appear to be regular on their face, in accordance with the law, and signed by Mr. Jamieson as president of petitioner. Petitioner has not offered any evidence

---

[10]See also *Fiore v. Commissioner*, T.C. Memo. 1979–360, affd. without published opinion 636 F.2d 1208 (3d Cir. 1980).

as to lack of his authority, and has accordingly failed to carry its burden on the question of proper execution. See *National Water Main Cleaning Co. v. Commissioner*, 16 B.T.A. 223 (1929).

Petitioner alternatively argues that the consents were invalid because they were not intended to apply to deficiencies in the personal holding company tax. Petitioner apparently contends that each waiver is for the assessment of income taxes, and therefore should not have been used here because the personal holding company tax is not an income tax, but rather, a penalty tax imposed on corporations for shielding passive income. With this we cannot agree. The personal holding company tax is imposed by section 542, which is located in subtitle A entitled "Income Taxes." Penalties and additions to tax, however, are found in subtitle F entitled "Procedure and Administration." Nonetheless, even if petitioner's contention is correct, in *Picard v. Commissioner*, 28 T.C. 955, 961 (1957), we indicated that the word "tax" in such waivers included any applicable interest, penalty, or other additions to tax. See also *Marbut v. Commissioner*, 28 T.C. 687 (1957). We think that the waivers in the instant matter embraced the personal holding company tax. See *Commercial Finance Co. v. Commissioner*, T.C. Memo. 1968–229.

We accordingly hold that respondent is not time-barred from assessing and collecting the personal holding company tax owed by petitioner.

*Decision will be entered for the respondent.*